PRESENT:  All the Justices

KENNETH ALONZO HODGES, II
                                        OPINION BY
v.   Record No. 051386          JUSTICE G. STEVEN AGEE
                                      September 15, 2006
COMMONWEALTH OF VIRGINIA


          FROM THE COURT OF APPEALS OF VIRGINIA

     Kenneth Alonzo Hodges, II, appeals from the judgment of the

Court of Appeals of Virginia, which affirmed his convictions for

first-degree murder, in violation of Code § 18.2-32, and use of

a firearm while in the commission of a felony, in violation of

Code § 18.2-53.1.  Hodges asserts that the Court of Appeals

erred in holding that the trial court did not commit reversible

error by admitting into evidence certain statements made by the

victim, Shelly Marie Jackson, prior to her death.  Hodges argues

that the admission of these statements violated the

Confrontation Clause of the Sixth Amendment to the United States

Constitution and Virginia's hearsay rules.  For the reasons set

forth below, we will reverse the judgment of the Court of

Appeals.

          I.   BACKGROUND AND MATERIAL PROCEEDINGS BELOW

     Under well-settled principles of appellate review, we

consider the evidence presented at trial in the light most

favorable to the Commonwealth, the prevailing party in the trial

court.  "We also accord the Commonwealth the benefit of all

inferences fairly deducible from the evidence." Riner v. Commonwealth, 268 Va. 296, 303, 601 S.E.2d 555, 558 (2004); see also Burns v. Commonwealth, 261 Va. 307, 313-14, 541 S.E.2d 872, 877-78, cert. denied, 534 U.S. 1043 (2001).

The evidence at trial showed that during the investigation of a burglary at Jackson's apartment, Lieutenant Brian K. Lovelace of the South Boston Police Department uncovered evidence that Jackson was selling marijuana. Jackson was arrested for the distribution of marijuana and, while being questioned by police, wrote a confession ("Jackson's Written Statement"), dated April 17, 2002, in which she claimed that Hodges approached her about selling marijuana for him and provided her with the marijuana she sold.

Hodges was arrested on a charge of conspiracy to distribute marijuana on April 18, 2002,[1] but released on bond, which required that he have no contact with Jackson.

Shelly Jones ("Shelly"[2]), Jackson's cousin, testified that on the day before Hodges' preliminary hearing on the conspiracy charge, Jackson asked Shelly to accompany her to Cody Store, a local store, because she needed "to talk to [Hodges] about

---

[1] Lt. Lovelace testified that he had already begun an investigation of Hodges prior to obtaining Jackson's Written Statement, and that as a result of his entire investigation, Hodges was charged.

court." According to Shelly, when they arrived at Cody Store, Jackson "went over and . . . started talking" to Hodges' wife. Shelly saw Hodges "walking up and down . . . on the other side of the street" while Jackson and Hodges' wife were talking, but she did not see Hodges and Jackson speak to each other.

Lt. Lovelace testified that at Hodges' preliminary hearing on June 24, 2002, Jackson "decided at that time she wasn't going to testify" and that some of the charges against Hodges were dismissed. However, Lt. Lovelace further testified that he intended to reinstate those charges for the September 2002 grand jury term because he believed Jackson would change her mind about testifying against Hodges.

On August 30, 2002, Jackson met with her attorney regarding the distribution of marijuana charge still pending against her. Jackson's attorney recommended that Jackson cooperate with the Commonwealth's Attorney by testifying against Hodges in order to avoid additional charges, incarceration, or losing custody of her young daughter. Jackson's attorney testified that Jackson did not indicate whether she would testify. That same day, Hodges' wife telephoned the home of Jackson's mother to speak with Jackson, but Jackson was not there to receive the call.

---

[2] To avoid confusion with the decedent and another witness, Missy Jones, Shelly Jones is herein referred to as "Shelly" and Missy Jones as "Missy."

Another of Jackson's cousins, Missy Jones ("Missy"), testified that on August 31, 2002, Jackson told her that although "she didn't really want to testify [against Hodges at his trial,] she had to."

Jackson's sister, Angela Jackson, testified that at 11 a.m. the next day, September 1, 2002, Jackson received a telephone call at the apartment where she and Angela resided. Angela recognized the telephone number listed on the caller identification as Hodges' cellular telephone number.[3] Immediately after receiving the telephone call, Jackson left the apartment with her daughter.

Jackson's friend and babysitter, Farah F. Canada, testified that "about twelve noon," Jackson arrived at Canada's residence in order to leave her daughter with Canada. Canada further testified that Jackson said she was going to "meet [Hodges, but] would be right back." This was the last time Jackson was seen alive. Canada also testified that she watched Jackson's daughter on earlier occasions while Jackson said she was meeting Hodges "down the dirt road . . . past his house."

---

[3] The police investigator who later took Angela's statement retrieved the telephone number from Angela's caller identification, which showed the call at 11 a.m. on September 1st. When the police investigator dialed the telephone number, Hodges answered. Hodges later told the police that he "kept [the telephone with that number] with him all the time[,] unless it [was] on the charger inside the home."

Angela reported to police her sister was missing on the evening of September 2, 2002. On September 4, 2002, the police discovered Jackson's body on rural property in Halifax County owned by Hodges' parents. The medical examiner testified that Jackson had sustained four gunshot wounds, but was not able to determine what type of gun caused the injuries, nor was she able to establish the precise date or time of Jackson's death.

Police also discovered the car Jackson had driven after leaving Canada's home in the parking lot of a Ramada Inn in Reidsville, North Carolina. A cashier at a gas station adjacent to the Ramada Inn testified that Hodges was in his store the afternoon of September 1, 2002.

At trial, the Commonwealth presented evidence from an expert in forensic biology who performed DNA analysis on items retrieved from the crime scene. Hodges "could not be eliminated" as one of the contributors to DNA located on a knife found at the scene of the crime. The Commonwealth also presented evidence regarding Hodges' cellular telephone use on the afternoon of September 1, 2002. Numerous calls were placed between Hodges' cellular telephone and his home telephone and his wife's cellular telephone. Telephone records indicated that the earliest calls were routed through "South Boston area" telephone switches, while later telephone calls were routed

5

through Danville, then Henderson, North Carolina, and later Reidsville, North Carolina.

At trial, the Commonwealth introduced into evidence statements made by Jackson prior to her death to support its theory that Hodges killed Jackson in order to prevent her from testifying against him on the marijuana conspiracy charge. Over Hodges' objection, Lt. Lovelace was permitted to read Jackson's Written Statement to the jury. During cross-examination of Lt. Lovelace, Hodges introduced into evidence a written statement dated June 23, 2002, the date of the Cody Store meeting, which purportedly bore Jackson's signature, and stated that Jackson's Written Statement implicating Hodges in the sale of marijuana was "false[]" and made only because of police pressure. Missy, Shelly, and Canada were each permitted to testify regarding the statements Jackson made regarding her meetings with Hodges prior to her disappearance, her decision to testify against Hodges, and about her intended meeting with Hodges on the day of her disappearance.

Twice during its closing argument, the Commonwealth referred generally to Jackson's statements. First, the Commonwealth contended the statements were "direct evidence" from Jackson "to the extent that she is present to argue for herself." Later, the Commonwealth argued that Jackson's

6

statements were "direct evidence" in the case against Hodges and "Shelly Jackson is saying things from the grave as it were."

A jury found Hodges guilty of first-degree murder and fixed his punishment at 32 years' imprisonment. The jury also convicted Hodges of use of a firearm while committing or attempting to commit murder, for which they fixed his punishment at three years' imprisonment. The trial court entered judgment against Hodges in accordance with the jury's verdict.

On appeal to the Court of Appeals, Hodges contended, inter alia, that the admission of each statement purportedly made by Jackson was reversible error. The Court of Appeals affirmed Hodges' convictions, holding that the admission of each challenged statement was either proper or did not constitute reversible error.[4]  Hodges v. Commonwealth, 45 Va. App. 735, 613 S.E.2d 834 (2005).

## II.  ANALYSIS

On appeal to this Court, Hodges first contends the admission of Jackson's Written Statement violated the Confrontation Clause and Virginia's hearsay rules. Hodges also contends the Commonwealth should not have been permitted to introduce Jackson's oral statements to Missy, Shelly, and Canada

---

[4] On appeal to the Court of Appeals, Hodges assigned error to several other rulings by the trial court. However, Hodges either did not assign error to these other issues or we did not grant his petition for appeal regarding them.

because these statements were inadmissible hearsay and their admission also violated the Confrontation Clause. Hodges further asserts the trial court should have given a limiting instruction that Missy's testimony was not admitted for the truth of the matter asserted. Lastly, Hodges contends the Court of Appeals erred in holding that the trial court committed harmless error when it improperly admitted Canada's testimony about Jackson's statements about meeting with Hodges prior to September 2002.

### A. Jackson's Written Statement

Hodges filed a motion in limine to exclude Jackson's Written Statement, which the trial court denied because

> the purpose of offering this evidence or this statement is not to show the truth or falsity of her description or Ms. Jackson's description of Mr. Hodges as having been one who is involved with her in the drug offenses but rather to show the motive for the killing of Ms. Jackson.

The trial court concluded the admission of Jackson's Written Statement did not "violate[] the Defendant's constitutional right to confront witnesses against him and [is not admitted] for the truth of the matters asserted."

The Court of Appeals agreed and found no error in the admission of Jackson's Written Statement because "the Commonwealth offered evidence that Jackson had implicated [Hodges] in a marijuana distribution conspiracy in order to show

8

[Hodges] had a motive for killing [Jackson], not to show that he had in fact engaged in such a conspiracy."  Hodges, 45 Va. App. at 769, 613 S.E.2d at 850.  Furthermore, the Court of Appeals stated:

> because [Hodges] failed to proffer a limiting instruction – whether due to oversight or trial strategy – and because the Commonwealth did not rely on the evidence for an improper purpose, [Hodges] may not now complain about the trial court's failure to give a limiting instruction or the possibility that the jury may have considered Jackson's confession for the truth of its allegation that [Hodges] was a drug dealer.

Id. at 773, 613 S.E.2d at 852.

Hodges contends that, despite assurances to the contrary, the Commonwealth did use Jackson's Written Statement "for the truth of the matter asserted."  He argues that the Court of Appeals' decision  "eviscerate[s]" the Confrontation Clause as applied in Crawford v. Washington, 541 U.S. 36 (2004) and Tennessee v. Street, 471 U.S. 409 (1995).

Hodges asserts that the Supreme Court's decision in Street permitted the trial court to admit the prejudicial confession of an unavailable witness only as a "last resort" in order to "rebut[] a defense raised by the defendant."  By contrast, Hodges avers that the Commonwealth presented Jackson's Written Statement at its own initiative in order to "paint Hodges as a drug dealer" and "prejudice Hodges with the aura of bad acts, past crimes and drugs" throughout its case.  To further support

9

his argument, Hodges cites <u>Donahue v. Commonwealth</u>, 225 Va. 145, 300 S.E.2d 768 (1983), in which the Court held the Commonwealth's use of an out-of-court statement was to "prove the truth of its contents" despite its purported use when first admitted for "other purposes." Hodges also argues that the Court of Appeals' decision amounts to holding that Hodges' "failure to request a limiting instruction or redaction of [Jackson's Written Statement] constitutes a waiver of the Confrontation Clause claim, despite Hodges' objections to the confession and the trial judge's assurance that the objection was noted."

The Commonwealth responds that Jackson's Written Statement was properly admitted because it was offered "solely to prove [what Jackson] said [and] not offered to prove the truth of the matter asserted, i.e., that [Hodges] was a drug dealer." Furthermore, the Commonwealth argues the Court of Appeals correctly held "Hodges waived his right to have the jury instructed that it could consider the confession only as it related to [Hodges'] motive" because Hodges "never proffered such an instruction."

In Crawford, the Supreme Court held that the Confrontation Clause[5] bars the admission of an out-of-court testimonial statement used to establish the truth of the matter asserted unless the declarant is unavailable and the accused has had a prior opportunity to cross-examine the declarant.  541 U.S. at 59 n.9, 68.  Jackson's Written Statement constitutes a "testimonial" statement because it was a declaration "made for the purpose of establishing or proving some fact" during the course of a police interrogation.  Id. at 51-52, 68.  Furthermore, Jackson, the declarant, was clearly "unavailable" to testify and Hodges had no prior opportunity to cross-examine Jackson regarding her statement.  The disputed issue is whether Jackson's Written Statement was offered for the "truth of the matter asserted."

The Supreme Court reiterated in Crawford that the Confrontation Clause "does not bar the use of [out-of-court] statements for purposes other than establishing the truth of the matter asserted."  541 U.S. at 59 n.9 (citing Street, 471 U.S. at 414).  In Street, the trial court allowed the prosecutor to introduce an accomplice's confession in order "to rebut [the defendant's] testimony that his own confession was derived from [the accomplice's]."  471 U.S. at 414.  In holding that the

_____

[5] The Confrontation Clause guarantees an accused the right "to be confronted with the witnesses against him."  U.S. Const.

11

trial court's decision to admit this evidence did not violate

the Confrontation Clause, the Supreme Court observed:

> The nonhearsay aspect of [the accomplice's] confession
> – not to prove what happened at the murder scene but
> to prove what happened when [the defendant] confessed
> – raises no Confrontation Clause concerns. . . .
>
> If the jury had been asked to infer that [the
> accomplice's] confession proved that [the defendant]
> participated in the murder, then the evidence would
> have been hearsay; and because [the accomplice] was
> not available for cross-examination, Confrontation
> Clause concerns would have been implicated.

Id. at 414-16.

Relying on Crawford and Street, courts have since permitted

the admission of testimonial statements for "other purposes"

despite clear Confrontation Clause violations if those

statements had been admitted "for the purpose of establishing

the truth of the matter asserted."  E.g., United States v.

Logan, 419 F.3d 172, 177-78 (2d Cir. 2005) (conspirators'

statements to police admissible to show that conspirators

planned to use the same alibi).[6]

---

amend. VI.

[6] Other examples include: Derring v. McKee, No. 1:04-cv-796, 2006 U.S. Dist. LEXIS 8667, *27-*28 (W.D. Mich. Feb. 1, 2006) (victim declarant's out-of-court statements regarding defendant's alleged commission of another crime admissible "for the very purpose of showing that the statement was made"); State v. Newell, 710 N.W.2d 6, 24-27 (Iowa 2006) (out-of-court statements by unavailable declarants admissible to prove defendant's mother "attempted to cover-up for [the defendant] almost immediately[,]" "to show that [the statements] were made[,] and to "show that [declarant] was aware" of certain events); State v. Walker, 613 S.E.2d 330, 335 (N.C. Ct. App.

12

We find the decision of the Supreme Court of Arkansas in

Dednam v. State, 2005 Ark. LEXIS 8, No. CR 04-573 (Jan. 6,

2005), particularly useful given its similarity to the facts in

the case at bar.  In Dednam, the state's theory of the "case was

that Dednam killed [the victim] as a favor to [a third party,]

either in retaliation for identifying [the third party] as the

one who robbed him or to eliminate the testimony of the victim

of [the third party's] alleged crime."  Id. at *12.  Dednam

challenged the admissibility of statements made by the victim to

the police regarding the third party's criminal acts.  Id. at

*3-*4.  The court approved the admission of the victim's

statements, holding

> [the victim's] statements to [the detective] were not
> introduced to establish the truth of the matter
> asserted regarding [the third party's] crime against
> [the victim], but, instead, were introduced to
> demonstrate [the victim's] connection to [the third
> party] and, thus, Dednam's connection to [the
> victim]. . . . [E]stablishing motive does not equate
> to proving the truth of whether [the victim] was
> robbed or not.  Where a statement is admitted for a
> legitimate, non-hearsay purpose, that is, not to prove
> the truth of the assertions therein, the statement
> . . . raises no confrontation-clause concerns. . . .
> Because the statements were not admitted for the truth
> of the matter asserted, cross-examination was not
> required to test their veracity.  Hence, the
> statements are not barred by the Confrontation Clause.

Id. at *12-*15.

---

2005) (out-of-court statement of non-witness declarant
admissible for nonhearsay purpose of corroborating expert
witness' opinion).

Hodges' argument that the Commonwealth "paint[ed] Hodges as a drug dealer" in opening and closing arguments, and thus improperly used Jackson's Written Statement for the truth of its contents, is unpersuasive when the record is viewed in context. In arguing for the admissibility of Jackson's Written Statement, the Commonwealth's Attorney stated, "[Jackson's Written Statement] is important [because Jackson] implicated [Hodges] in a case that was [going to] be tried and this provided his motive for getting rid of her." He later suggested that if Hodges was concerned about possible misuse of Jackson's Written Statement, the appropriate response would be a cautionary instruction to the jury stating the limited purpose for which it was to be considered. Thus, the Commonwealth properly contemplated the limited purpose of proving motive as the basis for which Jackson's Written Statement would be used.[7]

Although the text of Jackson's Written Statement does allege Hodges conspired with Jackson to distribute marijuana, the specific references by the Commonwealth's Attorney during opening and closing argument present the statement's contents as

---

[7] Jackson's Written Statement was relevant to showing motive because other evidence presented at trial permitted the inference that Hodges was aware that Jackson had implicated him in a conspiracy to distribute drugs. This is plainly evident from the fact that Hodges introduced into evidence the June 23rd statement, in which Jackson recanted her Written Statement to the police and denied that Hodges was a party to the distribution of marijuana.

14

being Jackson's allegations rather than independent statements of fact that Hodges actually conspired with Jackson to distribute marijuana.  In opening argument, the Commonwealth's Attorney said that Jackson "gave a complete statement saying that for some time she indeed had been selling marijuana . . . and that she was doing it for . . . Hodges[.]  So she implicated Mr. Hodges as being part of the conspiracy."  This statement does not argue as fact that Hodges actually conspired with Jackson to distribute marijuana, but only that Jackson had told police that he had.

Similarly, in summarizing the evidence presented at trial during closing argument, the Commonwealth's Attorney described the claims in Jackson's Written Statement as damaging to her and also to Hodges, whether or not the acts attributed to Hodges were true:

> [Jackson's Written Statement was] written out by her
> [a]nd when you look at it she explains everything that
> happened in the course of this conspiracy, that she
> was supplied by [Hodges] with the marijuana and that
> she sold it from [her] apartment . . . . It's a very
> damning thing.  And frankly, Shelly Jackson didn't
> help herself out by giving it in the sense that she
> inculpated herself and she was obviously looking at
> some serious charges.

While pointing out that Jackson had "inculpated herself," the Commonwealth's Attorney did not argue Jackson's accusations inculpated Hodges or were statements of fact of acts actually committed by Hodges.  The Commonwealth's Attorney then noted

15

that Jackson's Written Statement only "identified [Hodges] as her supplier," not that Hodges in fact supplied Jackson with marijuana. The record thus supports the conclusion that the Commonwealth did not introduce or use Jackson's Written Statement as proof of the veracity of its contents.

Hodges' reliance on Donahue is also unpersuasive. In Donahue, we held the Commonwealth improperly used a written note that had been admitted for a proper nonhearsay purpose to establish the truth of the note's contents instead. 225 Va. at 152, 300 S.E.2d at 771-72. However, as noted above, the record in this case does not support a finding that the rationale for introducing Jackson's Written Statement, to show motive, was altered by an actual use of the statement to prove its contents as true.

Contrary to Hodges' assertion, the Supreme Court's decision in Street does not limit the introduction of an out-of-court statement only to occasions where the defendant has put the matter at issue or where "no alternative[]" means of presenting the evidence is available. 471 U.S. at 415. The Supreme Court specifically recognized in Street that the existence of alternative means of presenting the evidence does not make them "the only option constitutionally open." Id. at 416. Furthermore, while Hodges argues that the Commonwealth could have used other means short of reading all of Jackson's Written

Statement to the jury to achieve the purpose for which the statement was admissible, Hodges did not seek such alternatives at trial. Hodges did not ask the trial court to redact any of Jackson's Written Statement, and thus did not "afford the trial court the opportunity to rule intelligently" on the alternatives he now proposes and has waived the issue on appeal. See Rule 5:25; Riner, 268 Va. at 325, 601 S.E.2d at 571-72.

The admission of Jackson's Written Statement does not violate Virginia's hearsay rules for the same reason that it does not violate the Confrontation Clause – the statement was not admitted for the truth of the matter asserted. An out-of-court statement not admitted for "the truth of the matter asserted" is not hearsay, and therefore is not barred by the general rule against the admissibility of hearsay. Manetta v. Commonwealth, 231 Va. 123, 127, 340 S.E.2d 828, 830 (1986).

Lastly, the Court of Appeals did not, as Hodges asserts, hold that Hodges' failure to request a limiting instruction waived his right to appeal the trial court's decision to admit Jackson's Written Statement. Hodges' claim in this regard fundamentally mischaracterizes the decision of the Court of Appeals.

Hodges properly preserved his objection to the trial court's rulings regarding Jackson's Written Statement on the basis of the Confrontation Clause and Virginia's hearsay rules.

17

He was permitted to, and did, raise both arguments on appeal. Only after rejecting these arguments on the merits did the Court of Appeals address the separate issue of a limiting instruction.

In so much as the trial court ruled that Jackson's Written Statement was admissible for the limited purpose of showing motive, Hodges was entitled to a jury instruction stating that the statement was not to be considered as evidence of the truth of the matters asserted in it. See id. at 127 n.2, 340 S.E.2d at 830 n.2. However, the record shows Hodges never requested or proffered such an instruction. Accordingly, the Court of Appeals did not err in holding that Hodges had waived the right on appeal to argue he was entitled to a limiting instruction regarding Jackson's Written Statement.[8] See Rule 5A:18; Rule 5:25; Riner, 268 Va. at 325, 601 S.E.2d at 571-72; Manetta, 231 Va. at 127 n.2, 340 S.E.2d at 830 n.2; see also Crider v. Commonwealth, 206 Va. 574, 578, 145 S.E.2d 222, 225 (1965).

B.   Jackson's Oral Statements

1.   Admissibility Under the Confrontation Clause

In Crawford, the United States Supreme Court stated the conditions for admissibility are different depending on whether

---

[8] Our previous decisions have held that trial courts are "not required to give [a limiting] instruction [regarding the purpose for which evidence may be considered] sua sponte." Manetta, 231 Va. at 127 n.2, 340 S.E.2d at 830 n.2; see Commercial Distributors, Inc. v. Blankenship, 240 Va. 382, 394,

18

an out-of-court statement by an unavailable declarant is "testimonial" or "nontestimonial." 541 U.S. at 68. The parties correctly agree that Jackson's oral statements to Missy, Shelly, and Canada are "nontestimonial" declarations.

Hodges asserts the admission of Jackson's nontestimonial oral statements violated the Confrontation Clause because none satisfied the requirement articulated in Ohio v. Roberts, 448 U.S. 56 (1980), and later cases applying that decision, that there be specific indicia of reliability supporting each statement. However, the record shows Hodges failed to make this argument at trial with regard to any of the nontestimonial statements except Canada's testimony about Jackson's statement on September 1, 2002, that she was going to meet Hodges. Accordingly, Hodges waived his argument based on the Confrontation Clause with respect to all the other statements. See Rule 5:25; Riner, 268 Va. at 325 n.11, 601 S.E.2d at 572 n.11. Hodges contends Canada's testimony of Jackson's September 1, 2002 statement did not satisfy the requirements for admissibility under Roberts because the "Court of Appeals' newly revised 'state of mind' exception was incredibly broad and offered no guarantees of trustworthiness." In addition, Hodges asserts Canada's statements "were not credible." A recent

_____

397 S.E.2d 840, 847 (1990); see also Garcia v. Commonwealth, 21 Va. App. 445, 452, 464 S.E.2d 563, 566 (1995).

19

decision of the United States Supreme Court has negated these arguments.

Because Crawford involved a testimonial statement, the Supreme Court was not required in that decision to "definitively resolve" whether and in what form any Confrontation Clause analysis must be brought to bear in ruling on the admissibility of nontestimonial statements. However, in Crawford, the Supreme Court stated that the reliability test flowing from Roberts and its progeny "depart[ed] from the historical principles" of the Confrontation Clause, 541 U.S. at 60, in an "unpardonable" fashion, id. at 63, and "is inherently. . . unpredictable." Id. at 68 n.10.

In Crawford, the Court noted that one potential implementation of the Constitutional strictures would be that "we apply the Confrontation Clause only to testimonial statements, leaving the remainder to regulation [only] by hearsay law." Id. at 61. The Court commented that this approach was seemingly rejected in White v. Illinois, 502 U.S. 346 (1992), but that the analysis in Crawford itself "casts doubt on that holding [in White]." Crawford, 541 U.S. at 61. The two Justices concurring in Crawford labeled that decision an overruling of Roberts, id. at 69 (Chief Justice Rehnquist and Justice O'Connor, concurring), but because the majority opinion found it unnecessary to render an express holding on whether any

Confrontation Clause scrutiny at all is applicable to nontestimonial statements, 541 U.S. at 61, courts were left with uncertainty as to whether it remains appropriate to apply the "indicia of reliability" standards of Roberts and its progeny to nontestimonial statements.

In Davis v. Washington, ___ U.S. ___, 126 S.Ct. 2266 (2006), the Supreme Court found that it no longer had the "luxury of indecision" on "whether the Confrontation Clause applies only to testimonial hearsay." 126 S.Ct. at 2274. The Court proceeded to hold that the "answer to the first question was suggested in Crawford, even if not explicitly held," and the answer is that "[t]he text of the Confrontation Clause" focuses upon "testimonial hearsay," and "[i]t applies to 'witnesses' against the accused – in other words, those who 'bear testimony.' " Id. ___, 126 S.Ct. at 2274. The Court held: "A limitation so clearly reflected in the text of the constitutional provision must fairly be said to mark out not merely its 'core,' but its perimeter." Id. (emphasis added). Finding that a particular "911 call" did not involve a "testimonial" statement, the Court approved use of the statements therein with no consideration of any indicia of reliability, see id. at ___, 126 S.Ct. at 2277-2278, and expressly approved the State court decision in that case, which was premised on the complete inapplicability of Roberts and

reliability considerations where nontestimonial statements are involved.  Id. at ___, 126 S.Ct. at 2280; see also State v. Davis, 111 P.3d 844, 848, 852 (2005) (Crawford "overturned" Roberts and no reliability analysis is to be undertaken).  In Davis the Supreme Court states that it had "overruled Roberts in Crawford," 126 S.Ct. at 2275 n.4, and makes it clear that

> [o]nly statements of this [testimonial] sort cause the declarant to be a "witness" within the meaning of the Confrontation Clause. It is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause.

Id. at ___, 126 S.Ct. at 2273 (emphasis added).

In the present case, therefore, admissibility of the evidence given by Canada recounting Jackson's nontestimonial September 1, 2002 statement is determined under the law of hearsay rather than the Confrontation Clause.  We therefore turn to the hearsay issues.

2.  Admissibility Under the State-of-Mind Exception

Separate from his Confrontation Clause argument, Hodges contends the Court of Appeals erred in approving the trial court's admission of Jackson's statements to Missy, Shelly, and Canada under the state-of-mind exception to the hearsay rule. Hodges asserts the "Courts of Appeals' decision relating to 'state of mind' evidence breaks dangerous new ground" by permitting the introduction of such evidence even when the

22

defense has not alleged that the death was the result of suicide, accident, or self-defense.  He claims the Court of Appeals misconstrued the state-of-mind exception as articulated in Clay v. Commonwealth, 262 Va. 253, 546 S.E.2d 728 (2001), because the accused in that case had argued the victim's death was accidental, thus placing the victim's statements within the recognized state-of-mind exception permitting such "rebuttal" testimony.

The Commonwealth acknowledges "apparent inconsistencies in earlier Virginia decisions" regarding the state-of-mind exception, but argues "controlling precedent holds that any state of mind of a homicide victim is admissible as long as it is 'relevant and probative of some material issue in the case.' "  We agree with the Commonwealth.

Although the specific contours of the state-of-mind exception have evolved over time, the existence of an exception to the hearsay rule based on a declarant's "state of mind" is long-standing and unquestioned. See, e.g., Karnes v. Commonwealth, 125 Va. 758, 99 S.E. 562 (1919). We recently analyzed the admissibility of testimony showing a victim's state of mind in Clay.  There, we held the trial court did not err in allowing testimony regarding the victim's statements that she "planned to move because she was afraid of what [the accused] might do to her."  Clay, 262 Va. at 257, 546 S.E.2d at 730.

23

Although the accused in Clay raised the contention of accidental death, we did not limit a victim's declaration about his or her state of mind only to cases where the accused has alleged the killing was the result of accident, self-defense, or suicide, as Hodges contends. We determined that a spectrum of victim declarations are admissible based on relevance and probative value to a material fact:

> Generally, statements made by a crime victim that show the victim's state of mind are admissible as an exception to the hearsay rule, provided the statements are relevant and probative of some material issue in the case. Evidence is relevant if it tends to prove or disprove, or is pertinent to, matters in issue.
>
> While it is difficult to reconcile the conflicting cases as to when a victim's statements are relevant, much must be left to the trial court's discretion.

Id. at 257, 546 S.E.2d at 730 (citations omitted) (emphasis added).

The key to the admissibility of evidence showing a victim's state of mind is thus its relevance to a material issue in the case. Relevance exists when the evidence has a "logical tendency, however slight, to prove a fact at issue in a case." Winston v. Commonwealth, 268 Va. 564, 596, 604 S.E.2d 21, 39 (2004) (citations omitted), cert. denied, ___ U.S. ___, 126 S.Ct. 107 (2005).

Accordingly, we examine Jackson's nontestimonial oral statements to determine whether the statements showed Jackson's

then-existing state of mind and tended to "prove or disprove, or [were] pertinent to" determining a relevant issue in the case. We first examine Missy's testimony of Jackson's statement to her, as it is determinative of this appeal.

a. Missy's Testimony

The trial court permitted Missy to testify that two days before Jackson disappeared she told Missy she was going to testify against Hodges. The Court of Appeals determined the trial court did not err in admitting this statement under the state-of-mind exception because it satisfied the exception's requirements and "was relevant to the issue of [Hodges'] motive for murder because the circumstantial evidence permitted an inference that Jackson communicated this intent to [Hodges] before her death." Hodges, 45 Va. App. at 766, 613 S.E.2d at 848. We disagree.

Hodges asserted at trial, as he does on appeal, that Missy's testimony of Jackson's statement was "inadmissible because Jackson's state of mind was not a relevant or material issue." Hodges argued to the trial court "there's no evidence that [Hodges] ever knew that [Jackson] was going to testify. There's no evidence that that was ever communicated to him." Furthermore, Hodges argues the admission of Jackson's statement was prejudicial because the Commonwealth "repeated[ly] reli[ed]"

on Jackson's having "made up her mind" to testify against Hodges in its closing argument.

In Mullins v. Commonwealth, 113 Va. 787, 75 S.E. 193 (1912), we held that statements that the victim intended to testify against the accused in a separate criminal proceeding were inadmissible in the accused's trial for the victim's murder because "there was no evidence that the accused knew that [the victim] was to be a witness, or that he knew anything about the case." Id. at 789, 75 S.E. at 195. As we explained:

> [i]f the prisoner had known that Howell was to be a witness against him, the evidence would have been admissible, as tending to show a motive for the murder of Howell; for, where the motive of a party is a material inquiry in a cause, whether civil or criminal, any evidence which tends, in any degree, to throw light upon that question is admissible. But before a fact or circumstance is admissible in evidence against a party to show motive, such fact or circumstance must be shown to have probably been known to him, otherwise it could not have influenced him, for a man cannot be influenced or moved to act by a fact or circumstance of which he is ignorant.

Id. at 789-90, 75 S.E. at 195 (citations omitted); see also Robinson v. Commonwealth, 228 Va. 554, 558, 322 S.E.2d 841, 843 (1984).

The Commonwealth maintains it can be reasonably inferred Hodges knew of Jackson's intent to testify because the evidence showed Jackson's attorney encouraged Jackson to testify against Hodges on August 30th, Jackson made this statement on the 31st, Jackson disappeared on September 1st, and over that three-day

26

period Hodges and his wife attempted to reach Jackson by telephone several times.  In addition, the Commonwealth argues the evidence that Jackson and Hodges' wife discussed Jackson's allegations against Hodges at Cody Store several months earlier permitted the inference that Jackson would continue to discuss her intent to testify against Hodges with him or his wife.

This argument, accepted by the Court of Appeals, is defective because it rests upon successive speculative inferences to conclude knowledge, sufficient to show motive, on Hodges' part.  The Commonwealth's argument requires the initial inference that because Jackson may have talked to Hodges' wife at Cody Store in June regarding her earlier intent to testify against Hodges, she was more likely in September to discuss a new intent to testify against Hodges as expressed to Missy on August 31st.  There is no basis in the record to connect the two events, except pure speculation.  Furthermore, the record is devoid of evidence to prove that Jackson, or anyone else, ever communicated a decision by Jackson to testify against Hodges to him.  The record contains no evidence of any actual communications between Hodges or his wife and Jackson after her refusal to testify at his preliminary hearing on the drug conspiracy charges, until the September 1 telephone call, of which there is no detail other than Jackson was to meet Hodges.  Although Hodges and his wife attempted to call Jackson on other

27

occasions, the record does not reflect they ever communicated. Jackson gave no indication to her attorney or anyone else except Missy that she would testify against Hodges.

To conclude from this evidence that Jackson communicated her intent to testify against Hodges to him is pure speculation. As we said in Mullins, an individual cannot be induced to act by a fact or circumstance that he did not know. While Jackson's statement to Missy is evidence of her state of mind, the statement should not have been admitted because it was not relevant to a material issue in the case, in particular, Hodges' motive.[9]

Where a criminal case has been tried by jury, the court reviewing whether an error is harmless "must decide whether the alleged error substantially influenced the jury. If it did not, the error is harmless." Clay, 262 Va. at 259, 546 S.E.2d at 731. In Clay, we adopted the United States Supreme Court's test for nonconstitutional harmless error, as articulated in Kotteakos v. United States, 328 U.S. 750, 764-65 (1946):

---

[9] Because we find the Court of Appeals erred in approving the trial court's decision to admit this evidence, we need not address Hodges' additional argument that the trial court erred in admitting Missy's testimony without a limiting instruction. Because we find this testimony was inadmissible for lack of relevance, we do not need to address the Commonwealth's argument that the statement was admissible as non-hearsay because it was not admitted for the truth of the matter asserted. See Church v. Commonwealth, 230 Va. 208, 212, 335 S.E.2d 823, 825-26 (1985)

> If, when all is said and done, the conviction is sure that the error did not influence the jury, or had but slight effect, the verdict and the judgment should stand . . . . But if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. . . . If so, or if one is left in grave doubt, the conviction cannot stand.

Clay, 262 Va. at 259-60, 546 S.E.2d at 731-32 (quoting Kotteakos, 328 U.S. at 764-65).

Jackson's statement to Missy was the only evidence presented that Jackson indicated she had changed her mind regarding testifying against Hodges since her refusal to testify at Hodges' preliminary hearing. Thus, it was a critical component of the Commonwealth's case to show Hodges' motive for murdering Jackson. Applying the harmless error test and Code § 8.01-678,[10] we cannot say that the admission of Jackson's statement that she was going to testify against Hodges did not influence the jury; therefore, the error was not harmless. Accordingly, the Court of Appeals erred in affirming the trial court's admission of Missy's testimony.

---

(evidence that is "non-hearsay" is admissible if it is relevant).

[10] Code § 8.01-678 states, in relevant part:
When it plainly appears from the record and the evidence given at the trial that the parties have had a fair trial on the merits and substantial justice has been reached, no judgment shall be arrested or reversed . . . [f]or any . . . defect, imperfection,

In so much as this error will require reversal of the judgment of the Court of Appeals and remand for a new trial, we will address Jackson's other nontestimonial statements to Shelly and Canada because the admissibility of that testimony is likely to arise in a new trial.

### b. Shelly's Testimony

Shelly was permitted to testify, over Hodges' objection, that on the day before Hodges' preliminary hearing on the drug conspiracy charge, Jackson went to Cody Store to talk to Hodges "about Court."[11] Hodges contends, as he did at trial, that Shelly's testimony is inadmissible hearsay because "Jackson's state of mind in June was wholly irrelevant and the incident was too remote to be probative in any way." Hodges also argues the evidence was unreliable because Shelly's testimony regarding the actual meeting at Cody Store reflected that Jackson did not actually talk to Hodges.

---

or omission in the record, or for any error committed on the trial.

[11] The Court of Appeals observed that Hodges did not object to any aspect of Shelly's testimony other than Jackson's identification of the person she was meeting (Hodges) and the topic she wanted to discuss with him (court). It thus limited its review of Shelly's testimony to her testimony regarding those two facts. The record supports the Court of Appeals' determination that Hodges' objection to Shelly's testimony at trial focused solely on Jackson's statement that she intended to talk to Hodges "about court" when she met him. Accordingly, we limit our review of the applicability of the state-of-mind hearsay exception and the relevance of the statement to this aspect of Shelly's testimony. See Rule 5:25.

The Commonwealth contends the statement was admissible because "[i]t tended to show she indeed discussed court at her meeting at Cody[] Store" and was "relevant because it bore upon her relationship with [Hodges]." The Commonwealth also contends the statement supported the Commonwealth's position that Hodges' motive for killing Jackson was based on his knowledge "that Jackson was going to testify against him."

In approving the trial court's decision to admit the statement, the Court of Appeals determined that it expressed "Jackson's then-existing state of mind," the record did not show any evidence that "Jackson had a motive to fabricate" the statement, and other evidence, introduced by Hodges, corroborated the accuracy of the statement. Hodges, 45 Va. App. at 765, 613 S.E.2d at 848. In addition, the Court of Appeals found the testimony

> probative of [Hodges'] motive because it showed his concern over whether the victim would testify against him at his preliminary hearing and indicated a likelihood that the victim later communicated to [Hodges] that she had changed her mind and intended to testify before the grand jury or at a later trial.

Id.

We agree with the Court of Appeals that Shelly's testimony was admissible under the state-of-mind exception and relevant to showing Hodges' knowledge of Jackson's accusations against him. In addition, it provides context for the June 23rd statement

31

Hodges produced and introduced at trial, which purported to explain and recant the Written Statement she gave to police. Shelly's testimony that Jackson said she was going to meet Hodges on June 23rd to talk "about court" was relevant to understanding Jackson's signature on the June 23rd statement and her refusal to testify against Hodges at his preliminary hearing on June 24th. In addition, it showed that Hodges was aware of the Jackson's Written Statement to police and was concerned that she would testify against him.[12] Accordingly, the admission of Jackson's statement to Shelly was not error and lay within the sound discretion of the trial court.

c. Canada's Testimony Regarding Jackson's Statement on September 1, 2002[13]

Hodges filed a motion in limine to exclude Jackson's oral statements to Canada that she was going to meet Hodges "down the dirt road past his house" on the day of her disappearance. Hodges asserted below, as he does on appeal, that this testimony

_____

[12] As Hodges notes, Shelly also testified regarding her observations of the actual meeting, at which Jackson spoke with Hodges' wife rather than Hodges. Shelly further stated that she observed Hodges "walking up and down the . . . other side of the street" during the meeting. This additional testimony does not, as Hodges argues, bar the admissibility of Jackson's statement regarding her intended topic of conversation, but would be appropriately considered by the jury in determining the weight and credibility afforded this evidence.

[13] In view of the reversal of the judgment, we need not address Hodges' assignment of error that admitting Jackson's statements to Canada regarding her previous meetings with Hodges was not harmless error.

was inadmissible because Jackson's state of mind was irrelevant to any material issue in the case. In addition, Hodges contends the Commonwealth was wrongly permitted to use the statement of Jackson's intent as proof of Hodges' conduct.

In response, the Commonwealth asserts that this testimony was admissible under the state of mind exception "because [the fact that] Jackson said she intended to meet [Hodges] at the dirt road [made it] more probable that she indeed met him there."[14]

The trial court denied Hodges' motion, finding "the statement . . . is offered to show the expressed intention of [Jackson] to meet Mr. Hodges." The trial court observed there was "absolutely no evidence that is apparent to the Court to indicate any contrivance on her part, any reason for her to have made that statement in a contrived manner." Accordingly, the trial court ruled that Jackson's "state of mind or intent to meet Mr. Hodges is certainly relevant to the case [having been] made shortly before the disappearance and the death of the victim."

Similarly, the Court of Appeals held the trial court did not err in admitting Canada's testimony because it was "relevant

---

[14] Because we find that this testimony was admissible under the Hillmon state-of-mind exception analysis, we need not address the Commonwealth's argument that this testimony was also admissible as non-hearsay.

33

to the issue of whether Jackson did, in fact, meet [Hodges] that day," which in turn was "relevant to the issue of [Hodges'] guilt or innocence." Hodges, 45 Va. App. at 762, 613 S.E.2d at 846-47.

We agree with the Court of Appeals that this testimony was admissible under the principles established in Mutual Life Ins. Co. v. Hillmon, 145 U.S. 285 (1892).[15] In Hillmon, the United States Supreme Court held the trial court erred in refusing to admit into evidence letters written by a missing person, Walters, to his family in which he expressed "the intention of leaving Wichita with Hillmon." 145 U.S. at 294-95. In so holding, the Supreme Court stated:

> The existence of a particular intention in a certain person at a certain time being a material fact to be proved, evidence that he expressed that intention at that time is as direct evidence of the fact, as his own testimony that he then had that intention would be.
>
> . . . .
>
> The letters in question were competent, not . . . as proof that he went away from Wichita, but as evidence that, shortly before the time when other evidence tended to show that he went away, he had the intention of going, and of going with Hillmon, which made it more probable both that he did go and that he

---

[15] In Karnes, we favorably cited Hillmon as support for the proposition that statements showing a declarant's "mind at a particular time, his statements and declarations indicating his state of mind are generally admissible . . . as exceptions to the hearsay rule, and have been characterized as 'verbal acts.' " 125 Va. at 764-65, 99 S.E. at 564; see also Goodloe v. Smith, 158 Va. 571, 583, 164 S.E. 379, 383 (1932).

34

went with Hillmon, than if there had been no proof of such intention.

Id. at 295-96.[16]

Similarly, Canada's testimony expressed Jackson's then-existing state of mind, which was the intent to meet with Hodges in a location near the site of the murder.  As in Hillmon, Canada's testimony of Jackson's intent was admissible "not . . . as proof that [she] actually went[,] but as evidence that . . . [s]he had the intention of going, and of going with [Hodges], which made it more probable both that [s]he did go and that [s]he went with [Hodges], than if there had been no proof of such intention."  See Hillmon, 145 U.S. at 296.  The analysis in Hillmon and Hunter v. State, 40 N.J.L. 495 (1878), confirms this testimony was admissible as proof of Jackson's intent and the corresponding probability that she indeed met Hodges on the day of her disappearance.  See also United States v. Pheaster, 544

---

[16] Hunter v. State, 40 N.J.L. 495 (1878), a case favorably cited by the Supreme Court in Hillmon, is also instructive.  In Hunter, the New Jersey court held that a murder victim's oral and written statements the "afternoon before the night of [his] murder" in which he said he "was going with [the accused] to Camden on business, were rightly admitted in evidence." Hillmon, 145 U.S. at 299 (citing Hunter, 40 N.J.L. at 534).  The Supreme Court in Hillmon quoted the Hunter court's observation:
> At the time [the statements were] given, such declarations could, in the nature of things, mean harm to no one; he who uttered them was bent on no expedition of mischief or wrong, and the attitude of affairs at the time entirely explodes the idea that such utterances were intended to serve any purpose but that for which they were obviously designed.

F.2d 353, 375-80 (9th Cir. 1976); <u>Lisle v. State</u>, 941 P.2d 459, 467 (Nev. 1997), <u>overruled in part on other grounds by</u> <u>Middleton v. State</u>, 968 P.2d 296, 315 (Nev. 1998); <u>State v. Terrovona</u>, 716 P.2d 295, 298-300 (Wash. 1986).

The context of Jackson's statement – telling her babysitter where she was going and when she would return to pick up her daughter – do not contain any indicia of fabrication or incentive to lie.  And Jackson's conduct following the telephone call to her apartment on the morning of September 1st was a relevant issue at the trial.  Accordingly, the Court of Appeals did not err in approving the trial court's decision to admit this testimony.

### III.  CONCLUSION

The Court of Appeals did not err in approving the trial court's admission of Jackson's Written Statement and Jackson's statements to Canada about the events of September 1, 2002 and her statements to Shelly about the Cody Store meeting.  However, the Court of Appeals did err in approving the trial court's admission of Missy's testimony that Jackson said she was going to testify against Hodges.  Accordingly, we reverse the judgment of the Court of Appeals, vacate Hodges' convictions, and remand the case to the Court of Appeals with instructions to remand the case to the trial court for a new trial in accordance with the

<u>Id</u>. (quoting <u>Hunter</u>, 40 N.J.L. at 538).

principles expressed in this opinion, if the Commonwealth be so advised.

Reversed and remanded.

JUSTICE KINSER, with whom JUSTICE LEMONS joins, dissenting in part and concurring in part.

While I agree with much of the majority opinion, I respectfully dissent from the portion concerning Missy Jones' testimony and the majority's conclusion that the admission of her testimony was not harmless error. The evidence of Kenneth Hodges' guilt was overwhelming. Hodges "had a fair trial on the merits and substantial justice has been reached." Code § 8.01-678. Thus, I conclude that any error in admitting her testimony was harmless.[1]

The provisions of Code § 8.01-678 state when a judgment should not be reversed:

> When it plainly appears from the record and the evidence given at the trial that the parties have had a fair trial on the merits and substantial justice has been reached, no judgment shall be arrested or reversed:
>
> . . . .
>
> 2. For any other defect, imperfection, or omission in the record, or for any error committed on the trial.

---

[1] Because I conclude any error was harmless, I do not need to decide whether the circuit court actually erred in admitting Missy Jones' testimony.

We have applied this statute in both criminal and civil cases, Clay v. Commonwealth, 262 Va. 253, 259, 546 S.E.2d 728, 731 (2001), and in light of its provisions, adopted the test set forth in Kotteakos v. United States, 328 U.S. 750 (1946), for nonconstitutional harmless error:

> "If, when all is said and done, the conviction is sure that the error did not influence the jury, or but had slight effect, the verdict and the judgment should stand . . . . But if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. . . . If so, or if one is left in grave doubt, the conviction cannot stand."

Clay, 262 Va. at 260, 546 S.E.2d at 731-32 (quoting Kotteakos, 328 U.S. at 764-65).

Under this test, and Code § 8.01-678, we must look at the totality of the evidence in determining whether, in this case, the admission of Missy Jones' testimony "did not influence the [verdict], or had but [a] slight effect" on it. Kotteakos, 328 U.S. at 764-65; see Rose v. Commonwealth, 270 Va. 3, 12, 613 S.E.2d 454, 459 (2005) (because evidence of guilt was overwhelming, admittance of evidence about prior criminal activity was harmless); Clay, 262 Va. at 260-61, 546 S.E.2d at 731-32 (because evidence of guilt was overwhelming, exclusion of police officer's testimony corroborating defendant's testimony

38

was harmless).  Thus, I will now summarize some crucial evidence presented at Hodges' trial.

In April 2002, Shelly Jackson made a written statement to the police in which she implicated Hodges in a marijuana distribution conspiracy.  At the time Jackson made her statement, the South Boston Police Department was already investigating Hodges, and Jackson's statement provided the additional information needed to arrest Hodges for conspiracy to distribute marijuana.

After his arrest, Hodges was released on bond, with one of the conditions requiring him to have no contact with Jackson.  On June 23, 2002, however, after receiving a telephone call from either Hodges or his wife, Jackson asked her cousin, Shelly Jones, to accompany her to a local store because Jackson was going "to meet [Hodges] to talk to him about court."  At the store, Jackson talked with Hodges' wife, while Hodges paced up and down the street.  At trial, Hodges introduced into evidence a statement, purportedly signed by Jackson that day, recanting her previous statement to the police.[2]

The following day, at the preliminary hearing on the charges pending against Hodges, Jackson announced that she was not going to testify.  Because Jackson failed to testify, the

---

[2] Neither the police nor Jackson's attorney was aware of this statement prior to its production at trial.

Commonwealth was unable to proceed on the conspiracy charge. The investigating officer indicated he nevertheless planned to present charges against Hodges to the next grand jury, which was scheduled to meet in September 2002. The officer believed that Jackson would change her mind about testifying against Hodges.

Sometime after Hodges' preliminary hearing, the Commonwealth informed Jackson's attorney, Tracy Quackenbush Martin,[3] that unless Jackson testified against Hodges, the Commonwealth would bring a conspiracy charge against Jackson. Quackenbush informed Jackson that, with such a charge, the possibility of Jackson's receiving a period of incarceration increased substantially. The day before Jackson disappeared, Quackenbush met with her, reiterated the seriousness of a conspiracy charge, and advised her to testify against Hodges. Jackson did not give her attorney a final answer that day, and her attorney never saw her again.

During the time between Hodges' preliminary hearing, June 24, 2002, and the day Jackson disappeared, September 1, 2002, Hodges, either personally or through his wife, attempted to contact Jackson on numerous occasions, sometimes as often as "four or five times a week . . . two or three times a day." The day before Jackson disappeared, Hodges' wife called the home of

---

[3] Martin testified that she uses the name "Quackenbush" professionally.

40

Jackson's mother looking for Jackson.  On the morning of her disappearance, Jackson received a telephone call at her sister's home at 11 a.m.  According to the caller identification function on her sister's telephone, the call came from Hodges' cellular telephone.  Hodges informed the police that he kept the cellular telephone with him at all times "unless it's on the charger inside the home."  Hodges' cellular telephone records showed that no calls were made either from or to his cellular telephone for about an hour and 40 minutes after the approximate time Jackson received the telephone call that morning.

Soon after receiving the telephone call from Hodges' cellular telephone, Jackson and her daughter left her sister's home, and Jackson took her daughter to stay with a friend, Farah Canada.  Jackson told Canada that she was going to meet Hodges "down the dirt road down past his house," and "she would be right back."  But, Jackson never came back.  It was off this road, on property owned by Hodges' parents, that Jackson's body was found three days later.

On September 2, 2002, Jackson's automobile was found in the parking lot of a Ramada Inn off Route 29 in Reidsville, North Carolina.  Through a photographic line-up, a clerk at a convenience store located adjacent to the Ramada Inn identified Hodges as having been in the store on September 1, 2002 sometime between 2:30 and 4:00 p.m.  At trial, the clerk identified

41

Hodges as the person he saw in the store that day.  Hodges'

cellular telephone records confirm that he was in the

Reidsville, North Carolina area  during the time period when the

store clerk saw him.  Furthermore, cellular telephone records

showed Hodges and his wife communicating back and forth as they

traveled separately on September 1, 2002 from the South Boston,

Virginia area, to the vicinity of Reidsville, North Carolina.

Testimony indicated that the most direct route between the two

locations is via Route 29.

Finally, the evidence at the crime scene also implicated

Hodges.  Jackson's body was found not only on property owned by

Hodges' parents but also in a location where Jackson was known

to have met Hodges previously.  The police officers who

investigated the scene where Jackson's body was found discovered

signs indicating the body had been dragged through the woods in

the direction of a shallow, rectangular hole.[4]  Based on the

rainfall in the area around the time that Jackson was killed and

the amount of water in the hole, it was likely dug prior to

September 1, 2002.

At the scene, the police found a knife from which a DNA

sample was recovered.  Testing revealed that more than one

---

[4] The police officer testifying referred to this hole as a
"make-shift grave."  Hodges objected to that testimony, and it
is not clear from the transcript whether the circuit court ruled
on the objection.

individual contributed to that DNA sample.  Hodges could not be excluded as a contributor of the DNA but Jackson was eliminated. Statistical analysis demonstrated that it was "billions of times more likely" that Hodges was one of the contributors of that DNA as opposed to two unknown individuals.

Despite the totality of this and other evidence proving Hodges' guilt, the majority concludes that Missy Jones' testimony about Jackson's statement that she had to testify against Hodges was a "critical component" of the Commonwealth's case with regard to Hodges' motive for murdering Jackson.  I do not agree.  Whether Hodges actually knew Jackson had changed her mind, while lending strength to the Commonwealth's argument regarding motive, was not a determinative factor.  Hodges knew that Jackson had given a statement to the police implicating him in a drug conspiracy.  On the day before Hodges' preliminary hearing, Hodges or his wife apparently persuaded Jackson to sign a statement recanting her prior statement to the police.  The handwriting in the body of the statement was different from both Jackson's signature on it and Jackson's handwriting on the statement given to the police.  Furthermore, the very next day, Jackson decided not to testify at Hodges' preliminary hearing. After the preliminary hearing, Hodges or his wife attempted to contact Jackson on numerous occasions up until the day she disappeared, and someone using Hodges' cellular telephone did in

43

fact talk to her that day.  From this evidence, the jury could reasonably infer that Hodges remained concerned about whether Jackson would ultimately testify against him.  Killing Jackson eliminated the risk.  That alone was sufficient motive irrespective of whether Hodges knew that Jackson had indeed changed her mind.

Not only was Missy Jones' testimony superfluous to the Commonwealth's case concerning Hodges' motive, it was also only a small part of three days of testimony regarding Jackson's murder and Hodges' involvement.  Through numerous witnesses and exhibits, the jury knew that Jackson was going to meet Hodges on the day she disappeared.  The jury knew that Hodges traveled to the Reidsville, North Carolina area that same day and that Jackson's vehicle was found in the area the next day.  The jury also knew that Hodges could not be eliminated as a contributor of DNA on a knife found at the crime scene.  Finally, Jackson's body was discovered on property owned by Hodges' parents, which was a location where Jackson had met Hodges on previous occasions.

Under Clay and its progeny, in order for this Court to grant a new trial, it must find that the jury was "substantially swayed" by Missy Jones' testimony.  262 Va. at 260, 546 S.E.2d at 732.  Given the overwhelming evidence establishing Hodges' motive for killing Jackson and actually implicating him in her

44

murder, I conclude that any error in admitting Missy Jones' testimony did not influence the jury and was therefore harmless. Id. at 260, 546 S.E.2d at 731-32.

For these reasons, I respectfully concur in part and dissent in part and would affirm the judgment of the Court of Appeals.