*100 UPON A REHEARING EN BANC
ANNUNZIATA, Judge.
On October 5, 1999, a panel of this Court affirmed the convictions of Robert Lewis Clay for second degree murder and use of a firearm in the commission of murder. We granted Clay’s petition for rehearing en banc to consider his contention that the trial court erred by (1) refusing to allow him to cross-examine witnesses Thelma Burns and Carlos Ragland during the voir dire conducted outside the jury’s presence, (2) admitting hearsay evidence from these two witnesses, and (3) refusing to allow him to call Deputy David Martin as a witness. We find no reversible error and, for the following reasons, we affirm the convictions.

FACTS

On August 25, 1996, Clay entered the Halifax County Sheriffs Office and asked to speak to Lieutenant Ernest Powell. Appearing “shook-up” and “upset,” Clay told Powell he had shot his wife, Joy Clay. Powell told the dispatcher to call the rescue squad. When the rescue squad arrived at Clay’s home, they found Mrs. Clay’s dead body on the den floor. Mrs. Clay had died from two gunshot wounds.
At trial, Thelma Burns testified outside the presence of the jury, and later before the jury, that she spoke -with Mrs. Clay every other day. In the months prior to her death, Mrs. Clay asked Burns whether she could move boxes to Burns’ home, as she planned to move because she “was very scared of what her husband might do to her.” During one telephone conversation, Burns overheard Clay say to Mrs. Clay, who had just attended a funeral, “I’m going to kill you bitch, you can’t never go with me to any of my family’s funerals and I’m tired of you, I’m going to kill you, bitch.” During a telephone conversation only days before Mrs. Clay was killed, Burns overheard Clay say to Mrs. Clay, “[Y]ou might have got that school bus, but *101 you won’t drive that school bus.”[1]
At trial, Carlos Ragland testified outside the presence of the jury, and subsequently to the jury, that Mrs. Clay told him about a month before her death that she was planning to move “because she was afraid of what might happen to her.” During another telephone conversation, Ragland overheard Clay call Mrs. Clay a “B” and say that “he was going to kill her because he was tired of her.”
Robert Lewis Clay, Jr., the only son of Clay and Mrs. Clay, testified that his mother told him in phone conversations during the month leading up to her death that “she was moving away and getting another job in Roxboro somewhere” because she “couldn’t take it no more.” Robert testified that Clay was an avid hunter who practiced “safe firearms.” Robert never saw Clay load or unload a gun inside the house, and Clay taught him to keep the safety switch on until ready to shoot.
Clay testified that when he confronted his wife about $5,000 missing from his gun cabinet, she first denied knowing anything about the money but then admitted taking the money and refused to return it. Clay “just got all upset” and took a gun from his gun cabinet. Clay testified that he thought his wife would tell him where the money was if she saw the gun. Clay claimed that when he “raised the gun up it just went off.” Clay claimed the gun discharged twice, although he did not recall pulling the trigger.

CROSS-EXAMINATION DURING VOIR DIRE

Clay contends the trial court erred by refusing to allow him to cross-examine Burns and Ragland during the voir dire conducted outside the presence of the jury. He claims that the Sixth and Fourteenth Amendments to the Constitution of the United States, and Article I, Section 8, of the Virginia Constitution give him the right to confront his accusers. *102 Therefore, he contends the trial court erred in refusing to allow defense counsel to cross-examine Burns and Ragland during voir dire conducted outside the presence of the jury.
Although Clay objected when the trial judge refused to allow defense counsel to cross-examine Burns and Ragland on voir dire conducted out of the presence of the jury, he did not do so on constitutional grounds and did not specify any constitutional grounds. No ruling of the trial court will be considered as a basis for reversal unless the objection was stated together with the grounds therefor at the time of the ruling, except for good cause shown or to enable this Court to attain the ends of justice. See Rule 5A:18.
The record does not reflect any reason to invoke the good cause or ends of justice exceptions to Rule 5A:18. Prior to the trial, defense counsel advised the trial court that he had ascertained that the Commonwealth might present certain witnesses to whom Mrs. Clay made statements before she died. He assumed they would be adverse. Defense counsel stated that “it would be appropriate to let Mr. Greenbacker [Commonwealth’s Attorney] ask them the questions that he’s going to ask them and hear their responses so I can make the appropriate objections, because there’s some indication that she said she was going to leave or that he had been mean to her or something along those lines.... ”
The Commonwealth’s Attorney stated that he did not want to have a mini-trial but would “submit to the court or make a proffer.” Defense counsel replied: “All I wanted to do was to see if I could hear what they were going to say before so I could object to it, preserve the record, make the appropriate objections, and then the jury can hear whatever you see fit.” Both the trial judge and the Commonwealth’s Attorney agreed to this procedure.
In due course, the Commonwealth called Burns as a witness. She submitted to what is called in the record a “Voir Dire Examination,” out of the presence of the jury. Mr. Greenbacker first fully examined the witness. When he concluded, defense counsel commenced to cross-examine the wit *103 ness. The Commonwealth’s Attorney objected, stating, “[I] think the proffer of the evidence without cross-examination is probably the appropriate way to go at this point.” The trial judge sustained the objection and refused to permit cross-examination until such time as the witness was called as a witness in the trial before the jury. After argument of counsel, the judge further held that the evidence was admissible. Upon this record, we find no abuse of the trial court’s discretion. The purpose of the voir dire, as enunciated by defense counsel, was to permit defense counsel to hear the evidence prior to trial for the purpose of permitting him to “object to it, preserve the record, [and] make the appropriate objections.” That purpose was met. Furthermore, in the presence of the jury, defense counsel ultimately fully cross-examined both witnesses.

VICTIM’S HEARSAY TESTIMONY

Clay contends the trial court erred in admitting in evidence the testimony of Burns and Ragland regarding statements made to them by the victim, Joy Clay, indicating that she was going to leave Clay because she was afraid of what he might do to her.[2] Burns testified that on numerous occasions before the death of Joy Clay, she had telephone conversations with Mrs. Clay in which Mrs. Clay “asked [her if she] could ... bring some boxes to [her] house. [Mrs. Clay] stated that she was going to move because she was very scared of what her husband might do to her.” Burns testified she received like requests and intentions up to the time of Mrs. Clay’s death.
In similar phone conversations, Ragland testified the victim “told [him] she was planning on moving to Roxboro, North Carolina” and “she was going to move because she was afraid of what might happen to her.” Clay argued that the *104 evidence that Joy Clay had to get out of the house because she was afraid of what he might do to her did not prove that he intended to kill her. He contends the evidence was, therefore, not material, was highly prejudicial, and should not have been admitted in evidence. We disagree and find the evidence admissible under the state of mind exception to the hearsay rule to show Clay’s motive and intent.
A person seeking to have hearsay declarations admitted must clearly show that they are within an exception to the rule. See Doe v. Thomas, 227 Va. 466, 472, 318 S.E.2d 382, 386 (1984) (citations omitted); Foley v. Commonwealth, 8 Va.App. 149, 161, 379 S.E.2d 915, 921, aff'd en banc, 9 Va.App. 175, 384 S.E.2d 813 (1989). Hearsay evidence is inadmissible at trial unless it falls into one of the recognized exceptions to the rule. See Evans-Smith v. Commonwealth, 5 Va.App. 188, 197, 361 S.E.2d 436, 441 (1987).
The Commonwealth argues that the testimony of Burns and Ragland relating Joy Clay’s statements regarding her fear of Clay fall within the state of mind exception. The problem which arises in connection with the admissibility of such statements made by homicide victims is discussed in McCormick on Evidence: “The possibility of overpersuasion, the prejudicial character of the evidence, and the relative weakness and speculative nature of the inference, all argue against admissibility as a matter of relevance____ [T]he cases have generally excluded the evidence____” McCormick on Evidence § 276 (John W. Strong, ed., 4th ed. 1992) (footnotes omitted); see also United States v. Brown, 490 F.2d 758, 766 (D.C.Cir.1973).
Notwithstanding the general rule favoring exclusion, several exceptions have evolved, dictated by recurring factual circumstances which make the statements’ relevance manifest.
[I]n some circumstances, [a victim’s state of mind] statements may be admissible under other hearsay exceptions, such as that for startled utterances or dying declarations____ There is broad agreement that such statements are admissible where the defense claims self-defense, sui *105 cide, or accidental death, because in each of those situations the decedent’s fear helps to rebut aspects of the asserted defense.
McCormick on Evidence § 276; see also Brown, 490 F.2d at 766.[3]
Under Virginia law, statements that tend to prove the state of mind of the victim “are admissible ... [only] when the statements are relevant and material.” Johnson v. Commonwealth, 2 Va.App. 598, 602, 347 S.E.2d 163, 165 (1986) (citations omitted); see Kauffmann v. Commonwealth, 8 Va.App. 400, 406, 382 S.E.2d 279, 282 (1989).[4] We also noted in Hanson v. Commonwealth, 14 Va.App. 173, 416 S.E.2d 14 (1992), that
[f]or the state of mind of the victim to be relevant to prove the state of mind of the accused, some nexus must exist which inferentially implicates the accused, such as by showing “previous threats made by the defendant towards the victim, narrations of past incidents of violence on the part of the defendant or general verbalizations of fear of the defendant.”
*106 Id. at 188-89, 416 S.E.2d at 23 (quoting Brown, 490 F.2d at 765-66).[5]
Applying these principles, we find that the state of mind of a homicide victim is relevant and material in cases where accidental death is mounted as a defense. See Hanson, 14 Va.App. at 188, 416 S.E.2d at 23 (citing Evans-Smith, 5 Va.App. at 198, 361 S.E.2d at 442); see also West v. Commonwealth, 12 Va.App. 906, 910, 407 S.E.2d 22, 24 (1991). The inquiry does not end, however, with a court’s determination of relevancy. The proffered evidence must be further examined by the court to “undertake the familiar balancing process in which the relative degrees of relevance and prejudice are weighed and determined.” Brown, 490 F.2d at 774; McCormick on Evidence § 185. Where outweighed by the prejudicial effect it may have on the fair determination of the issues, such evidence will be excludéd. See 490 F.2d at 774.
In this case, Clay was charged with first degree murder and use of a firearm in the commission of murder. In a first-degree murder case, the Commonwealth must prove that the defendant killed the victim, that the killing was malicious, and that the killing was willful, deliberate and premeditated. See Painter v. Commonwealth, 210 Va. 360, 364, 171 S.E.2d 166, 169-70 (1969) (citing McDaniel v. Commonwealth, 77 Va. 281, 283-84 (1883)). Clay’s contention that the killing was accidental put his state of mind at issue, see Parsons v. *107 Commonwealth, 138 Va. 764, 777, 121 S.E. 68, 71 (1924), and concomitantly established the predicate for the admission of the challenged hearsay testimony. Testimony of the victim’s fear is relevant to Clay’s claim that the shooting was accidental and not deliberate. See McCormick on Evidence § 185; Brown, 490 F.2d at 773-74. Logically, a deceased’s fear of an individual accused of murder is inconsistent with a claim that the events in question culminating in the death were the result of “pure chance.” See Black’s Law Dictionary 15 (6th ed. 1990) (an “accident,” “if happening wholly or partly through human agency, [is] an event which under the circumstances is unusual and unexpected by the person to whom it happens”). Thus, the hearsay statements in question tend to establish Clay’s motive and intent and they are probative rebuttal of his contention that the shooting was not willful or deliberate. See Batten v. Commonwealth, 190 Va. 235, 245-46, 56 S.E.2d 231, 236-37 (1949) (the accused’s state of mind is material in a homicide case); Parsons, 138 Va. at 777, 121 S.E. at 71; Hanson, 14 Va.App. at 188-89, 416 S.E.2d at 23. See also Elliott v. Commonwealth, 30 Va.App. 430, 437-38, 517 S.E.2d 271, 275 (1999) (where the accused claims the victim’s death was an accident and not murder, “the state of mind of the victim is relevant to prove the state of mind of the accused and the nature of their relationship”).
We must now determine whether the prejudicial effect of such evidence outweighed its probative value. Some of the factors which may be considered in determining whether the evidence is unduly prejudicial and the trial court abused its discretion in judging the balance in favor of admission include whether the content of the statements tends to “arouse the jury’s hostility or sympathy for one side without regard to the probative value of the evidence,” McCormick on Evidence § 185, at 780, and whether it tends to confuse or mislead the trier of fact, see id. at 781, or distract it to irrelevant considerations. See id. Finally, where the proofs and counterproofs of such facts require an inordinate amount of time to accomplish, the evidence may properly be excluded. See id.; State v. Patricia A.M., 176 Wis.2d 542, 500 N.W.2d *108 289, 294 (1993) (“Evidence is unduly prejudicial when it threatens fundamental goals of accuracy and fairness of trial by misleading jury or by influencing jury to decide case on improper basis, and unfairness attaches if evidence tends to influence outcome by improper means, or it appeals to jury’s sympathies, arouses its sense of horror, promotes its desire to punish or otherwise causes jury to base its decision on extraneous considerations.”). The particular factors that may be determinative vary with the case. See Evans-Smith, 5 Va. App. at 197, 361 S.E.2d at 441; see also Beck v. Commonwealth, 253 Va. 373, 382, 484 S.E.2d 898, 904 (1997).
We find the probative effect of the evidence was not outweighed by its potential for prejudicing the jury in its consideration of the issues. The witnesses’ statements were limited to describing the victim’s plan to move because she feared what her husband might do to her; neither past acts nor threats by Clay were specifically referenced or recounted. Thus, the witnesses’ statements effectively reflected the victim’s state of mind and not Clay’s prior conduct. Cf. Brown, 490 F.2d at 777 (victim’s statement which included a reference that she feared the accused would kill her, found to be improper); id. at 775 (“[T]he more narration of past acts or conduct of the defendant contained in the statement, the greater the danger of jury misuse.” (citations omitted)); McCormick on Evidence § 276. Furthermore, the statements were not highly emotional or inflammatory in content and they were thus unlikely to distract the jury from the main issues in the case. Additionally, the statements were relevant as rebuttal to the defense of accidental death, and, in light of the proper admission of Clay’s threats to kill his wife, were unlikely to confuse or mislead the jury in this case. Finally, an inordinate amount of time was not consumed in the offer of proof and counterproofs in this case. For these reasons, we cannot say the trial court abused its discretion in admitting the statements.

REFUSAL TO ALLOW MARTIN TO TESTIFY

After the Commonwealth rested its case, Clay attempted to call Deputy David Martin as a witness on his *109 behalf. The Commonwealth objected, contending that Clay’s statements to Martin were inadmissible hearsay and that Clay was attempting to imply to the jury that evidence had been “improperly suppressed by the prosecution.” The Commonwealth also contended that Clay was attempting to admit Clay’s statements into evidence through Martin when he did not intend to testify himself. Clay asserted that the court should permit Martin to testify because he had observed Clay after the shooting and had taken written statements from him at the sheriffs office. Martin had no other participation in the case.
The trial court excluded the testimony of Martin, stating that “it’s kind of setting up a straw man to knock it down or something.”
Clay proffered for the record the following summary of Martin’s proposed testimony:
His name is David Martin. He was instructed to obtain a full statement from Mr. Clay if he was willing to give one. He indicated he would give one. He was read his standard Miranda rights. The statement is approximately four pages long in Martin’s handwriting. About thirty minutes later, Martin returned and asked Clay some more questions. During the thirty minute interim, Clay was in the presence of Martin, except maybe for a second or two. Clay’s demeanor throughout the entire process was somber and quiet. Those two words best described Clay to Martin. Clay was cooperative.
Lieutenant Powell had previously testified that Clay arrived at the sheriffs department appearing “shook up or shaken” and upset. Clay asked to speak privately with Powell and admitted killing his wife. He gave his house key to Powell to make sime the law enforcement officers could enter the house. This evidence showed that Clay sought out the police to admit shooting his wife, that he was cooperative, and that he was visibly shaken and upset.
Martin’s testimony would have been corroborative of Clay’s testimony but cumulative of Powell’s testimony. *110 “[C]orroborative testimony and cumulative testimony are not the same thing. Cumulative testimony is repetitive testimony that restates what has been said already and adds nothing to it. It is testimony of the same kind and character as that already given.” Massey v. Commonwealth, 280 Va. 436, 442, 337 S.E.2d 754, 758 (1985) (citation omitted). Corroborative evidence is evidence that does not emanate from the defendant’s mouth, does not rest wholly upon the defendant’s credibility, but is evidence that adds to, strengthens, and confirms the defendant’s testimony. See id. at 442-43, 337 S.E.2d at 758; see also Proctor v. Town of Colonial Beach, 18 Va.App. 28, 441 S.E.2d 233 (1994); Cash v. Commonwealth, 5 Va.App. 506, 364 S.E.2d 769 (1988). “[W]here evidence is merely cumulative its introduction may be limited by the court. Yet, because of the constitutional right t'o call for evidence in one’s favor, even cumulative evidence should sometimes be admitted. Where testimony is material ‘even though cumulative to some extent’ it should nonetheless be considered.” Massey, 230 Va. at 442, 337 S.E.2d at 758.
Clay was entitled to call witnesses in his defense, and Martin’s testimony, subject to appropriate objections by the Commonwealth’s Attorney, was admissible. We find the trial court erred in excluding Martin as a witness.
It remains only to determine whether the trial court error was harmless beyond a reasonable doubt. See Chapman v. California, 386 U.S. 18, 22-23, 87 S.Ct. 824, 827-28, 17 L.Ed.2d 705 (1967); Scott v. Commonwealth, 25 Va.App. 36, 42, 486 S.E.2d 120, 122-23 (1997); Hope v. Commonwealth, 8 Va.App. 491, 497, 386 S.E.2d 807, 810-11 (1989). Where the evidence of guilt is overwhelming, the error will be held harmless. Scott, 25 Va.App. at 42, 486 S.E.2d at 123. ‘We will not reverse a judgment for error in excluding evidence where it appears from the record that the error ... could not and did not affect the verdict.” Pace v. Richmond, 231 Va. 216, 226, 343 S.E.2d 59, 65 (1986) (internal quotation omitted) (citing, inter alia, Williamson v. Commonwealth, 180 Va. 277, *111 284, 23 S.E.2d 240, 243 (1942)). We find that the erroneous exclusion of the evidence was harmless.
The evidence overwhelmingly proved that Clay deliberately shot his wife. He admitted in a detailed, written statement to Deputy David Martin that he shot her. In his written statement and in his testimony at trial, Clay stated that he discovered $5,000 missing from his gun cabinet. He went to the den where his wife was sitting on a sofa. He confronted her about the missing money and she denied knowing anything about it, but then admitted taking the money. She refused to return it. Clay testified that he became upset. He went to the bedroom where his gun cabinet was located. He obtained one of his several guns. He did not look to see if it was loaded, and he did not load it. He then went back to the door of the den where his wife was seated. Clay told her, “I needed the money,” raised the gun up, and it went off. He did not remember discharging the gun and did not remember pulling the trigger. Clay testified that he “thought if she seen the gun she might tell me where my money was at.” He testified the gun went off twice.
Clay’s son testified that he was the executor of his mother’s estate and went through her papers and effects. He never found any cash as large as “a thousand dollars or two thousand dollars.” He did not find that she had transferred any large sum of money to or from any accounts. Clay stated in his statement to Deputy Martin that he never found the $5,000. It can be reasonably inferred from this testimony that the $5,000 never existed and that the dispute over the funds between Clay and his wife was fabricated to conceal his guilt. See Rollston v. Commonwealth, 11 Va.App. 535, 547-48, 399 S.E.2d 823, 830 (1991).
Robert Clay, Jr., further testified that he grew up in the household with his parents, that his father was a hunter and hunted every hunting season, that his father had “over three” firearms, and that his father taught him how to hunt. Both men always “practiced safe firearms.” He never saw his father load or unload a gun in the house. His father always *112 cleaned his guns regularly during the off-season. Robert had never known his father to keep a gun in his house that had shells chambered in it.
James L. Pickleman, an employee at the Virginia Division of Forensic Science Laboratory in the firearms section, testifying as an expert in firearms, stated that if the gun was loaded, one would have to push the safety switch open and then pull the trigger to fire , the gun. This action fires the shell in the chamber. The murder weapon is automatic loading; the firing of the shell ejects it from the gun. When fired, the pellets are expelled from the muzzle, the recoil action pushes the bolt , back and discharges the empty shell, and the next shell from the magazine is loaded into the chamber. The gun is then ready to be fired again. However, the trigger would have to be pulled again to fire the second shot! Pickleman further testified that the trigger mechanism on the weapon would not fire easily, stating that it would take three and three-quarters pounds of pressure to pull the trigger on each occasion. He further testified that the only way the gun could fire the second time would be for the trigger to be pulled by applying the necessary amount of pressure. Pickleman’s testimony provided strong evidence that Clay did not accidentally fire the shotgun.
To further meet Clay’s defense of accidental death and to prove the motive and intent of the accused, Burns and Ragland testified to the threats Clay made against his wife. During one telephone conversation between Burns and the victim, Burns overheard Clay in the background say to Joy Clay, who had just returned from attending a funeral, “I’m going to kill you bitch, you can’t never go with me to any of my family’s funerals and I’m tired of you, I’m going to kill you, bitch.” Ragland also testified that during a telephone conversation with Joy Clay, he heard Clay in the background call his wife a “B” and say that “he was going to kill her because he was tired of her.”[6]
*113 Finally, Dr. Glen Robert Groben, a medical examiner, testified that the victim received two shotgun wounds to the body. One wound was to the head and chest; the other was to the left side of the body. In his opinion, both wounds were lethal and the victim would have died in minutes from loss of blood.
Evaluating the error in the context of all the evidence in the case, we find that, had the evidence been admitted, it would not have affected the verdict. There is little difference, between Martin’s proffered testimony and that given by Clay and Lieutenant Powell. In Martin’s testimony, Clay was reported to be somber, quiet, and was cooperative during the time the statements were taken in the calm of the sheriffs office. That Clay first appeared at the sheriffs office and appeared “shaken” and “upset” does not contradict Martin’s testimony that he appeared “somber” and “quiet” when giving the statement. The difference in the two statements is inconsequential, and Martin’s excluded testimony would have added nothing to the evidence presented by the testimony of Powell and Clay. We find that the error was harmless because it could not have affected the outcome of the case.
Accordingly, the trial court’s judgment is affirmed.

Affirmed.

. Although not entirely clear from the record, we deduce that Mrs. Clay had recently obtained a job as a school bus driver.

. Clay does not challenge the admissibility of the statements made by Clay to Joy Clay, and overheard by Burns and Ragland in telephone conversations, to the effect that he was going to kill her. These statements are considered herein under another exception to the hearsay rule.

. In Brown, the United States Court of Appeals observed as follows:
While there are undoubtedly a number of possible situations in which such statements may be relevant, the courts have developed three rather well defined categories in which the need for such statements overcomes almost any possible prejudice. The most common of these involves defendant’s claim of self-defense as justification for the killing.... Second, where the defendant seeks to defend on the ground that the deceased committed suicide---- A third situation involves a claim of accidental death.... In [cases where the defense is “accidental death”] the deceased’s statements of fear as to guns or of defendant himself ... are relevant in that they tend to rebut this defense.
Brown, 490 F.2d at 766-67.

. The admissibility of declarations under the state of mind exception is also conditional on three prerequisites: 1. The statement must refer to a presently existing state of mind. Although the mental state of emotion must exist at the time of the declaration, it may relate to matters occurring in the past or in the future; 2. There must be no obvious indication of falsification or contrivance; 3. The mental condition must be relevant to the case. See Charles E. Friend, The Law of Evidence in Virginia § 18-16 (5th ed. 1999).

. To the extent Hanson may be read to include a requirement that the state of mind declaration must have been communicated to the accused when the defense is accidental death, it is dicta. See Hardy v. Commonwealth, 110 Va. 910, 924, 67 S.E. 522, 527 (1910) (when defendant raises a justification defense, the victim’s statement must have been communicated to the defendant for it to be introduced in support of the defense); Taylor v. Commonwealth, 31 Va.App. 54, 63 n. 4, 521 S.E.2d 293, 297 n. 4 (1999) (en banc) (accidental death not included among the justification defenses). See also Brown, 490 F.2d at 765-66, 773-78, cited with approval in Hanson, 14 Va.App. at 188-89, 416 S.E.2d at 23, which makes clear that, while a requirement that the victim’s statements be communicated to the defendant may inhere in the exception when the hearsay statements are sought to be introduced in cases involving self-defense, the exception is not otherwise predicated on proof of such communication.

. This evidence was admissible as an exception to the hearsay rule when offered by the prosecution because it constituted the statement of *113 an opposing party. The jury was entitled to consider it to prove Clay’s motive and intent. See Alatishe v. Commonwealth, 12 Va.App. 376, 378, 404 S.E.2d 81, 82 (1991).