COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present: Judges Malveaux, Ortiz and Friedman
Argued at Norfolk, Virginia


MATTHEW ALLEN COGLIO

MEMORANDUM OPINION* BY
v.       Record No. 1313-22-1          JUDGE FRANK K. FRIEDMAN
DECEMBER 5, 2023

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF NEWPORT NEWS
Tyneka L.D. Flythe, Judge

S. Mario Lorello (James O. Broccoletti; Zoby & Broccoletti, P.C., on
brief), for appellant.

Tanner M. Russo, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


Matthew Coglio was convicted of second-degree murder, use of a firearm in the

commission of murder, and maliciously shooting into an occupied building. These charges all

stemmed from the same incident. Coglio's ex-girlfriend, April Logan, was also his roommate at

the time of her death. She died in their residence from a single gunshot wound to the head. The

bullet entered her right temple, traveled on an upward trajectory, and exited her left temple. The

autopsy showed that the muzzle of the gun was touching her head when it was fired. Coglio was

the only other person in the apartment when Logan died. He had a neighbor call the police and,

when they arrived, told them that Logan had shot herself.

A jury convicted Coglio of all three charges. The trial court upheld the verdicts. On

appeal, Coglio alleges that the evidence was insufficient to sustain each of his convictions, that

---

* This opinion is not designated for publication. *See* Code § 17.1-413(A).

the trial court erroneously admitted hearsay evidence, and that his convictions for both second-degree murder and maliciously shooting into an occupied dwelling violated double jeopardy.

BACKGROUND

"In accordance with familiar principles of appellate review, we recite the facts in the light most favorable to the Commonwealth, as the prevailing party at trial." *Brown v. Commonwealth*, 75 Va. App. 388, 398 n.5 (2022). On the morning of August 22, 2020, Newport News police were summoned to an apartment complex to investigate a reported disturbance. The police found Coglio and one of his neighbors outside an apartment building. At first, Coglio told the officer that he and his "girlfriend" had been watching videos and that the officer should go inside. When prompted for further explanation, Coglio said that "she shot herself in the head." Spontaneously, Coglio told the officer that he did not object to a pat down of his body. The officer entered a second-floor apartment of the building and found the dead body of April Logan in a chair in front of a computer desk. Logan had died from a single contact gunshot wound to the right side of her head.[1] Later testing revealed her blood alcohol content was 0.236%.

Logan and Coglio had dated intermittently since 2013, but had not been in a romantic relationship for three months. At the time of her death, Logan had been living in Coglio's apartment, but she had plans to move out in two weeks.

The Hours Before Logan's Death

On the night before the shooting, Logan went on a date with a man she had been seeing since June, then returned to the apartment at around 10:00 p.m. At some point, Logan and Coglio went to a local market to purchase alcohol together. A neighbor heard a loud argument at the apartment at 1:50 a.m. on August 22, 2020. Another neighbor heard "aggressive" yelling

---

[1] The autopsy report classified Logan's manner of death as "undetermined."

- 2 -

from the apartment at around 6:00 a.m. An hour later, Coglio appeared at that neighbor's door and told him to call the police.

Examination of Logan's and Coglio's cell phone records revealed seven outgoing calls, each lasting between one and six seconds, from Coglio's phone to Logan's between 4:13 and 4:23 a.m. The texts indicate that Logan was no longer at the apartment during this time frame. Coglio's phone records revealed a text from his phone to Logan's at 4:14 a.m., stating, "Answer before I lock the door and barricade you out." The final text message from Logan's phone was at 5:02 a.m. to a phone other than Coglio's.

Coglio's Interactions with the Police

While the police were investigating Logan's death on the morning of August 22, the police video recorded Coglio interacting with police officers in unusual and unexpected ways outside the apartment building. He placed his hands behind him as if expecting to be handcuffed, questioned officers repeatedly about the accuracy of gunshot residue (GSR) tests, joked that a particular officer would be his "chauffeur" to the police station, and commented that he should have grabbed some alcoholic beverages from his apartment "in all the panic." Later, when handcuffed, he asked for nicotine, stating: "You guys already got me, there's like twelve of you guys."

GSR testing showed primer residue on both of Logan's and Coglio's hands. Coglio told the police that he and Logan were watching Marine weapon training videos on the computer just before the shooting and he had left the room for the kitchen when the shot was fired. Coglio claimed that he ran to Logan and held her, then left to get help from a neighbor. When asked if he had touched Logan's body, he indicated he may have "leaned her back." Her body was

- 3 -

positioned with her right hand under her leg; she was right-handed, and the shot was to her right temple.[2] Coglio confirmed that the gun that fired the shot belonged to Logan.

The gun was found on a table to the left of the body—and not near the body. Coglio initially indicated that he did not remember moving the gun, but later acknowledged that he may have done so. The gun did not have blood on it.

Detective Rogers testified at trial about her interview with Coglio on August 22. In the interview, Coglio stated that he and Logan had "dat[ed] on and off since 2013," broke up three months before Logan's death, and were "mostly not together" at the time of her death. Coglio stated that Logan was set to move out of his apartment in "a couple weeks" and that he "wasn't happy about [Logan moving out] but there was nothing he could do about it."

In the interview, Coglio denied having physical arguments with Logan and stated that the police had been called to the site of a prior argument with Logan two years earlier. He recounted that this argument was preceded by a break-up and Logan "having boyfriends at the house," prompting Coglio to be "a little jealous."

Coglio told Detective Rogers that in the hours before Logan's death, Logan went to the movies "with her girlfriend, Alex," returned home, went to the market with Coglio to obtain beer, and drank with Coglio while the two watched Netflix and talked.[3] Coglio stated that the two "eventually moved to the computer table where they started watching YouTube videos," specifically "Marine Corps weapon training videos." Coglio then stated that it "wasn't really weapon training" but rather "[p]eople with sticks fighting."

---

[2] Coglio is left-handed.

[3] Logan, in fact, had not gone to the movies with a female friend—but with a male friend she had been seeing for several months.

Coglio told Detective Rogers that while he and Logan were watching videos, he went to the refrigerator, heard a loud pop, and turned to see Logan "leaned forward with red on the floor." Coglio stated that he ran to Logan, held her, and went to a neighbor's apartment to ask the neighbor to call the police but received no answer, at which point he returned to his apartment, where Logan was "breathing and choking." Coglio stated that he then went to the apartment of his downstairs neighbor, who called 911. Coglio stated that these events transpired "immediately" "[o]nce the shot went off." He did not return to the apartment, but waited outside for the police to arrive.

Coglio stated during the interview that he and Logan used dummy rounds "when they practiced their firearm drills." Some dummy rounds were found on the floor of the apartment. When asked to elaborate about the firearm skills he and Logan were practicing, Coglio stated that "April wanted to learn more about the firearm, how it works, clearing the chamber" and that he was "teaching her" not to point it at anything she did not want to shoot. Coglio stated that he "demonstrated it once but mainly [Logan] was doing all of the demonstrations." At the very end of the interview, Coglio stated that he and Logan "were not doing drills that night," that he "didn't see [Logan] doing anything with the gun that night," that he and Logan were "just watching videos," and that he and Logan had done drills earlier in the week, but not on the night of Logan's death. Coglio stated that he was "a thousand percent certain" Logan did not mean to shoot herself and that he knew he would be "put . . . in jail" and "blame[d]" when he called the police. Coglio consistently denied shooting Logan.

"Walking on Egg Shells"

Four days before her death, Logan and her friend, Alex Johnson, made plans to go to the pool or the mall together on August 22. Logan showed Johnson photos of the apartment where she planned to move in two weeks, as well as of appliances she had purchased for that apartment.

She also indicated that she thought she would be promoted at work. Logan said that she had been "walking on eggshells" around Coglio, he had been drinking more, and that she "was just trying to get through the next two weeks" before she moved out. Coglio objected to this testimony as hearsay, but the trial court admitted it as relevant to Logan's state of mind.

<u>Expert Testimony</u>

Dr. Jonathan Arden, a consultant in forensic pathology and medicine, provided expert testimony for the defense. He reviewed the autopsy report, toxicology report, photographs, and other evidence in the case. Dr. Arden agreed that Logan sustained a contact gunshot wound. He opined, "Contact gunshot wounds to the head are almost always suicidal." In Dr. Arden's experience, 99% of such wounds were self-inflicted. Dr. Gary Zientek also testified at trial. Dr. Zientek had performed the autopsy on Logan's body. Dr. Zientek testified that he had seen hundreds of contact gunshot wounds in his career; of those, only one had been a homicide rather than a suicide (and that wound was not to the head). While Dr. Zientek determined Logan's cause of death to be the gunshot wound to her head, he classified her manner of death as "undetermined."

<u>The Jury Convicts Coglio of All Charges and the Trial Court Upholds the Verdict</u>

The jury convicted Coglio of all charges. After trial but before sentencing, Coglio filed a motion to dismiss the charge of shooting into an occupied building on double jeopardy grounds. In *Commonwealth v. Gregg*, 295 Va. 293, 301 (2018), the Virginia Supreme Court found that double jeopardy principles barred convictions for both involuntary manslaughter under Code § 18.2-154 and common law involuntary manslaughter for the same act of shooting. By extrapolation, Coglio maintained that he was subjected to multiple punishments in violation of double jeopardy upon convictions for both maliciously shooting in an occupied building under

Code § 18.2-279 and second-degree murder. The trial court considered Coglio's motion but rejected it.

Coglio also argued that the Commonwealth's evidence did not exclude the reasonable hypotheses of innocence that Logan died from an accidental self-inflicted shooting or suicide. The trial court also denied this motion. This appeal followed.

ANALYSIS

I. Sufficiency of the Evidence

Coglio first assigns error to the trial court's denial of his motions to strike the evidence and to set aside the verdict. Coglio argues that the evidence was insufficient as a matter of law because it did not prove that the shooting was not accidental or an act of suicide. "On review of the sufficiency of the evidence, 'the judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'" *Ingram v. Commonwealth*, 74 Va. App. 59, 76 (2021) (quoting *Smith v. Commonwealth*, 296 Va. 450, 460 (2018)). "The question on appeal, is whether 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id.* (quoting *Yoder v. Commonwealth*, 298 Va. 180, 182 (2019)). "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018) (quoting *Banks v. Commonwealth*, 67 Va. App. 273, 288 (2017)).

This case is based on circumstantial evidence. This Court previously has stated that "in an appellate court's assessment of a sufficiency challenge, circumstantial evidence 'is as competent . . . as direct evidence' to prove the elements of a crime, 'provided it is sufficiently convincing to exclude every reasonable hypothesis except that of guilt.'" *Young v.*

*Commonwealth*, 70 Va. App. 646, 653 (2019) (alteration in original) (quoting *Simon v. Commonwealth*, 58 Va. App. 194, 206 (2011)).

"The Commonwealth, however, 'need only exclude reasonable hypotheses of innocence that flow from the evidence, not those that spring from the imagination of the defendant.'" *Id.* (quoting *Simon*, 58 Va. App. at 206). "The reasonable-hypothesis principle . . . is 'simply another way of stating that the Commonwealth has the burden of proof beyond a reasonable doubt.'" *Id.* at 653-54 (alteration in original) (quoting *Commonwealth v. Moseley*, 293 Va. 455, 464 (2017)). "The fact finder 'determines which reasonable inferences should be drawn from the evidence[ ] and whether to reject as unreasonable the hypotheses of innocence advanced by a defendant.'" *Id.* at 654 (alteration in original) (quoting *Moseley*, 293 Va. at 464). "Consequently, whether the evidence excludes all reasonable hypotheses of innocence is a 'question of fact,' and like any other factual finding, it is subject to 'revers[al] on appeal only if plainly wrong.'" *Id.* (alteration in original) (quoting *Thorne v. Commonwealth*, 66 Va. App. 248, 254 (2016)).

A. <u>There was Sufficient Evidence to Find the Defendant Guilty of the Murder</u>

Second-degree murder "is defined as a malicious killing." *Woods v. Commonwealth*, 66 Va. App. 123, 131 (2016). "In order for an act to be done maliciously, the act must be done 'wilfully or purposefully.'" *Id.* (quoting *Essex v. Commonwealth*, 228 Va. 273, 280 (1984)). "Malice is evidenced either when the accused acted with a sedate, deliberate mind, and formed design, or committed any purposeful and cruel act without any or without great provocation." *Id.* (quoting *Branch v. Commonwealth*, 14 Va. App. 836, 841 (1992)).

Coglio was also found guilty of maliciously shooting into an occupied building, in violation of Code § 18.2-279. For purposes of our analysis of the sufficiency of the evidence against Coglio, this code section states:

- 8 -

> If any person maliciously discharges a firearm within any building when occupied by one or more persons in such a manner as to endanger the life or lives of such person or persons, or maliciously shoots at, or maliciously throws any missile at or against any dwelling house or other building when occupied by one or more persons, whereby the life or lives of any such person or persons may be put in peril, the person so offending is guilty of a Class 4 felony. . . .

Coglio's third conviction stemmed from Code § 18.2-53.1, which states: "It shall be unlawful for any person to use or attempt to use any pistol, shotgun, rifle, or other firearm or display such weapon in a threatening manner while committing or attempting to commit" certain crimes, including murder.

Each of Coglio's convictions stemmed from circumstantial evidence. This evidence included the fact that, from Coglio's own statements, he and Logan were alone in the apartment at the time of the shooting. There is no evidence that anyone else was present. In an interview with police, Coglio told a detective that after Logan was shot, he ran to a neighbor to ask them to call the police. When the neighbor did not respond, Coglio returned to the apartment, where Logan "was breathing and choking." Coglio then went downstairs to another neighbor, who called 911. That neighbor testified that after calling police, he saw Coglio walk to the parking lot area, where he remained "for awhile" before returning to the neighbor's apartment and requesting that he call 911 again. Body camera footage reveals that when police arrived on scene, Coglio was once more in the parking lot area.

Neighbors overheard loud arguing coming from Coglio's apartment on the night in question. Logan had told a friend that she was "walking on eggshells" around Coglio until she could move out. Logan believed she was getting a promotion at work and had secured a new apartment and appliances for that apartment—facts that would permit a jury to infer that Logan was unlikely to commit suicide. Gunshot residue was found on Coglio's hands, and his DNA was found on the gun's "trigger/grip." When police arrived at the apartment and examined

Logan's body, Logan's right hand was "tucked slightly" under her leg; Coglio told police that Logan was right-handed. The Commonwealth contended that her right hand could not have delivered the fatal shot and still have landed under her body.

Coglio also made various conflicting statements to police. When police first arrived on scene, Coglio indicated that he and Logan had been playing with guns when Logan accidentally shot herself. Later that same day, in his police interview, Coglio stated that he and Logan were just watching videos and that he had not seen her "doing anything with the gun that night." Similarly, the gun used in the shooting was found on a table to the left of Logan; the gun "was not near her." Coglio initially stated he did not recall moving the gun after the shooting; yet when confronted by its location, he conceded he "might have picked [the gun] up" and "might have put it there."

While the physical evidence in this case is not decisive, it was up to the jury to determine what weight to give this evidence and what inferences to draw from it. We find that the jury's verdict was not plainly wrong and that the evidence was sufficient to sustain each of Coglio's convictions. The jury could, logically, have concluded that the man whose DNA was on the gun's trigger and grip, and who was upset his ex-girlfriend was moving out, and who was jealous of her outside relationship, shot her—after sending angry texts and getting into two shouting matches—when she returned from a late-night engagement.

B. <u>A Rational Jury Could Find that the Reasonable Hypothesis of Innocence was Overcome</u>

Coglio argues that the evidence here does not exclude a reasonable hypothesis of innocence. Specifically, he asserts that the evidence does not foreclose the theory that Logan

accidentally shot herself while extremely drunk. The point is argued persuasively—but, ultimately, we cannot say that the factfinder's verdict is plainly wrong.[4]

To be sure, there was compelling evidence weighing in favor of Coglio's "accidental shooting" theory. He told police from the beginning that Logan shot herself. Both medical examiners testified that typically this type of gunshot wound is a result of suicide, not homicide, Logan's DNA was found on the gun's trigger/grip, gunshot residue was found on Logan's hands, and dummy rounds were present on the apartment floor. Coglio also never made any statements admitting to firing the gun.

Several aspects of the shooting, however, militate against a self-inflicted wound. Again, Logan was right-handed; her body was found with her right hand tucked under her thigh, and the fatal shot entered her right temple. The gun was found on a desk to the left of, and not close to, her body. The gun did not have any blood on it. Someone had to have moved the gun—and Coglio was the only other person there. He claimed to rush immediately to Logan—and his hands were covered with blood thereafter.[5] Coglio's hypothesis that Logan shot herself does not gibe with Logan's right hand's placement, and the blood-free gun's location raises an inference that Coglio moved the gun.

Further, Coglio's conduct when the police arrived was, at best, erratic. He put his hands behind his back to be handcuffed as soon as officers returned from the shooting venue. He joked with officers about being "chauffeured" to the police station and about failing to grab alcohol

---

[4] Coglio also suggests that Logan could have committed suicide. Coglio, himself, told police he was a "thousand percent certain" she did not mean to shoot herself. The evidence indicated she was excited to begin the next chapter of her life and had taken positive steps to do so. A rational factfinder could easily reject the suicide theory under these circumstances.

[5] An expert did testify that a gun used in a contact shooting can be bloody—but also may not be. Coglio's hands, by his own account, were bloody from holding Logan. He actually stated he held Logan and tried to "put her brains back in her head." His hands were still covered with blood when the police arrived.

from his apartment. In seeking nicotine, he told officers, "You already got me . . . ." He also gave conflicting accounts of critical events.

The presence of his DNA on the gun's trigger and grip, and residue on his hands,[6] coupled with Logan's date earlier in the evening, a late night of arguing, Coglio's jealous streak, and Logan's imminent departure from Coglio's apartment (and life) could lead a rational jury to the conclusion that Coglio shot Logan after a night of significant tension. His shifting accounts to police of whether he moved the body, whether he touched the gun, and what kind of gun demonstrations were occurring that night also could have undercut his version of events. The jury was free to conclude that Coglio's shifting explanations to police about crucial details were indicative of an intention to conceal guilt. *See Rollston v. Commonwealth*, 11 Va. App. 535, 548 (1991) ("multiple inconsistent stories" can be evidence of guilt).

Ultimately, it is up to the jury to examine and weigh the evidence. *Supinger v. Stakes*, 255 Va. 198, 203 (1998) ("The role of a jury is to settle questions of fact."). The jury here was not left to speculate as Coglio asserts; it could reasonably have concluded that Logan could not have shot herself in the right temple with her right hand which was found under her thigh. The evidence supported that, after a loud dispute with Coglio earlier in the night, Logan left the apartment. Angry texts and unanswered calls followed, and the evidence supports a conclusion that Coglio and Logan's last night together was contentious. Logan returned and, again, angry shouting followed. Coglio was, under the evidence, the only other person in the room when the shooting occurred—and his changing versions of events could dissuade a rational factfinder from accepting his account that Logan shot herself. When the evidence is viewed in the best light to

---

[6] This physical evidence is not decisive (evidence showed that his DNA could have transferred to the gun at any time, including if he moved it after the shooting). There was also expert testimony that gunshot residue can be found on any person who is in a room where a gun is fired and can transfer onto your hands if you handle a gun that has been fired. Again, it was up to the jury to determine what weight to give this evidence.

the prosecution, as it must be, the Commonwealth satisfied its burden of putting on sufficient circumstantial evidence that a reasonable factfinder could have rejected Coglio's hypotheses of innocence. *See Park v. Commonwealth*, 74 Va. App. 635, 654 (2022); *see also Knight v. Commonwealth*, 61 Va. App. 148, 163 (2012) (factfinder is entitled to draw reasonable inferences from proved facts (citing *Moody v. Commonwealth*, 28 Va. App. 702, 706-07 (1998))). We cannot say that no rational factfinder could reach this verdict on this evidence.

## II. Hearsay

Coglio's second assignment of error asserts that the trial court erroneously allowed Alex Johnson to testify regarding hearsay statements made by Logan. Coglio claims that these statements were inadmissible because Logan's state of mind had not been relayed to Coglio prior to her death.

"We review a trial court's evidentiary ruling under an abuse of discretion standard." *Khine v. Commonwealth*, 75 Va. App. 435, 444 (2022). "If an admissibility determination involves a question of law, however, we review that issue de novo." *Id.* "And by definition, a trial court 'abuses its discretion when it makes an error of law.'" *Id.* (quoting *Porter v. Commonwealth*, 276 Va. 203, 260 (2008)).

"The key to the admissibility of evidence showing a victim's state of mind is . . . its relevance to a material issue in the case." *Id.* at 445 (quoting *Hodges v. Commonwealth*, 272 Va. 418, 436 (2006)).

> "[F]or the state of mind of the victim to be relevant to prove the state of mind of the accused, some nexus must exist which inferentially implicates the accused," such as "previous threats made by the defendant towards the victim, narrations of past incidents of violence on the part of the defendant or general verbalizations of fear of the defendant."

*Id.* (quoting *Clay v. Commonwealth*, 33 Va. App. 96, 105 (2000) (en banc), *aff'd*, 262 Va. 253 (2001)).

Coglio's assignment of error relates to the following statement by Johnson: "[Logan] told me she had been walking on eggshells and stated that [Coglio] had been drinking more and she was just trying to get through the next two weeks [before she moved out]." This testimony was objected to at trial by Coglio, and the trial court heard a proffer of the expected testimony outside the presence of the jury. Coglio argued that evidence showing a murder victim's state of mind is only relevant where the defense argues suicide, accident, or self-defense. While Coglio agreed that "we are on that posture," he argued that the state of mind must have been "communicated to the accused" in order to be relevant.

The Commonwealth relied in part on *Clay*, in which the defendant came to the police department to report that he had accidentally shot his wife. 33 Va. App. at 100. At trial, two witnesses testified that the wife had told them that she was going to leave the defendant because she was afraid of what he might do to her. The defendant objected to this hearsay testimony. The *Clay* Court found that "the state of mind of a homicide victim is relevant and material in cases where accidental death is mounted as a defense." *Id.* at 106. The Court noted that "[t]here is broad agreement that [a victim's state of mind] statements are admissible where the defense claims self-defense, suicide, or accidental death, because in each of those situations the decedent's fear helps to rebut aspects of the asserted defense." *Id.* at 104-05 (quoting *McCormick on Evidence* § 276).

Once the statements have been found to be relevant, the court must balance the relevance and prejudicial effect of the evidence. "Where outweighed by the prejudicial effect it may have on the fair determination of the issues, such evidence will be excluded." *Id.* at 106. The *Clay* Court concluded:

> Clay's contention that the killing was accidental put his state of mind at issue, and concomitantly established the predicate for the admission of the challenged hearsay testimony. Testimony of the victim's fear is relevant to Clay's claim that the shooting was

- 14 -

accidental and not deliberate. Logically, a deceased's fear of an individual accused of murder is inconsistent with a claim that the events in question culminating in the death were the result of "pure chance." Thus, the hearsay statements in question tend to establish Clay's motive and intent and they are probative rebuttal of his contention that the shooting was not willful or deliberate.

*Id.* at 106-07 (internal citations omitted). In weighing the probative value of the evidence against its prejudicial effect in *Clay*, the Court found the evidence admissible:

We find the probative effect of the evidence was not outweighed by its potential for prejudicing the jury in its consideration of the issues. The witnesses' statements were limited to describing the victim's plan to move because she feared what her husband might do to her; neither past acts nor threats by Clay were specifically referenced or recounted. Thus, the witnesses' statements effectively reflected the victim's state of mind and not Clay's prior conduct.

*Id.* at 108 (citations omitted).

Similarly, in *Hodges v. Commonwealth*, the Supreme Court found that "[t]he key to the admissibility of evidence showing a victim's state of mind is thus its relevance to a material issue in the case." 272 Va. at 436. The Court found that *Clay* "did not limit a victim's declaration about his or her state of mind only to cases where the accused has alleged the killing was the result of accident, self-defense, or suicide." *Id.* Instead, "a spectrum of victim declarations are admissible based on relevance and probative value to a material fact[.]" *Id.*

Coglio relies on *Hanson v. Commonwealth*, 14 Va. App. 173 (1992), in which this Court found that the victim's state of mind was not relevant because there was no evidence that the defendant was aware of that state of mind. *Id.* at 188. However, *Hanson* was limited by our holding in *Clay*, which specifically stated that *Hanson*'s requirement of communication of the victim's state of mind to the defendant was dicta. *Clay*, 33 Va. App. at 106 n.5.

Here, Logan's state of mind was relevant, especially as Coglio argued at trial that Logan's death resulted from an accidental shooting or suicide. Moreover, as in *Clay*, Johnson

- 15 -

did not testify as to any specific threats or acts of violence by Coglio in the past; instead, she testified only regarding Logan's state of mind. The trial court did not err in finding that Johnson's testimony was relevant to the main issue in the case and that its limited content was more probative than prejudicial. Therefore, the trial court did not err in admitting this testimony.

### III. Double Jeopardy

### A. Standard of Review

Coglio asserts that his convictions for second-degree murder and shooting into an occupied building violated his constitutional guarantees against double jeopardy. The double jeopardy clause protects against "(1) a second prosecution for the same offense after acquittal, (2) a prosecution for the same offense after conviction, and (3) multiple punishments for the same offense." *Commonwealth v. Hudgins*, 269 Va. 602, 604-05 (2005). "We review de novo whether 'multiple punishments have been imposed for the same offense in violation of the double jeopardy clause.'" *Commonwealth v. Gregg*, 295 Va. 293, 296 (2018) (quoting *Johnson v. Commonwealth*, 292 Va. 738, 741 (2016)). "When considering multiple punishments for a single transaction, the controlling factor is legislative intent." *Id.* at 298 (quoting *Kelsoe v. Commonwealth*, 226 Va. 197, 199 (1983)). "The Double Jeopardy Clause 'does not apply where the same conduct is used to support convictions for separate and distinct crimes.'" *Sandoval v. Commonwealth*, 64 Va. App. 398, 413 (2015) (quoting *Brown v. Commonwealth*, 37 Va. App. 507, 517 (2002)).

### B. Coglio Did Not Face Two Counts of Second-Degree Murder for the Same Killing

The trial court found that Coglio had been charged with endangering others by maliciously shooting in an occupied building—not with shooting in an occupied building, resulting in the death of another. The court determined that second-degree murder and

maliciously shooting into an occupied building under Code § 18.2-279 are distinct offenses with

distinct elements, negating any double jeopardy violation.

A conviction of shooting into an occupied building potentially may result in a second-

degree murder conviction under Code § 18.2-279, which states:

> If any person maliciously discharges a firearm within any building when occupied by one or more persons in such a manner as to endanger the life or lives of such person or persons, or maliciously shoots at, or maliciously throws any missile at or against any dwelling house or other building when occupied by one or more persons, whereby the life or lives of any such person or persons may be put in peril, the person so offending is guilty of a Class 4 felony. *In the event of the death of any person, resulting from such malicious shooting or throwing, the person so offending is guilty of murder in the second degree.* However, if the homicide is willful, deliberate and premeditated, he is guilty of murder in the first degree.
>
> If any such act be done unlawfully, but not maliciously, the person so offending is guilty of a Class 6 felony; and, in the event of the death of any person resulting from such unlawful shooting or throwing, the person so offending is guilty of involuntary manslaughter. If any person willfully discharges a firearm within or shoots at any school building whether occupied or not, he is guilty of a Class 4 felony.

(Emphasis added). Coglio argues that his convictions for shooting into an occupied building and

second-degree murder violated double jeopardy—specifically, that he "cannot be convicted of

two counts of second degree murder, one of which would be required under 18.2-279 since a

death occurred." He bases his argument on *Gregg v. Commonwealth*, 67 Va. App. 375 (2017),

*aff'd*, 295 Va. 293 (2018). In *Gregg*, this Court found a double jeopardy violation where a

defendant was convicted of common law involuntary manslaughter and "unlawfully shooting at

an occupied vehicle wherein death resulted." *Id.* at 377. Both convictions stemmed from the

same killing; thus, the single killing in *Gregg* improperly resulted in multiple involuntary

manslaughter convictions.

Shooting at an occupied vehicle is prohibited under Code § 18.2-154, which contains very similar language to Code § 18.2-279:

> Any person who maliciously shoots at, or maliciously throws any missile at or against, any train or cars on any railroad or other transportation company or any vessel or other watercraft, or any motor vehicle or other vehicles when occupied by one or more persons, whereby the life of any person on such train, car, vessel, or other watercraft, or in such motor vehicle or other vehicle, may be put in peril, is guilty of a Class 4 felony. In the event of the death of any such person, resulting from such malicious shooting or throwing, the person so offending is guilty of murder in the second degree. However, if the homicide is willful, deliberate, and premeditated, he is guilty of murder in the first degree.
>
> *If any such act is committed unlawfully, but not maliciously, the person so offending is guilty of a Class 6 felony and, in the event of the death of any such person, resulting from such unlawful act, the person so offending is guilty of involuntary manslaughter*.

Code § 18.2-154 (emphasis added). In *Gregg*, the defendant was specifically charged under Code § 18.2-154 with "involuntary manslaughter by shooting into an occupied vehicle causing death." 67 Va. App. at 379. The jury was instructed to find the defendant guilty of second-degree murder or of involuntary manslaughter if certain elements were met. *Id.* The jury did find that those elements were met and convicted the defendant of common law involuntary manslaughter *and* of involuntary manslaughter under Code § 18.2-154. This Court reversed the sentences for these convictions, finding that they violated double jeopardy.

1. Under the Statutory Framework the Prosecution Could Not Convict
   Coglio for Multiple Second-Degree Murders for the Single Killing at Issue

*Gregg* offers a useful framework for analyzing this double jeopardy question:

> Where legislative intent is evident from the face of the statute or the legislative history, it is not necessary to employ the test set forth in *Blockburger* [*v. United States*, 284 U.S. 299 (1932),] to determine whether a court can impose multiple punishments for a single act. However, when legislative intent is not expressly stated, we must rely on the *Blockburger* test.

- 18 -

*Id.* at 382-83. The *Gregg* Court found that "there is no clear legislative intent to allow convictions under both common law involuntary manslaughter and Code § 18.2-154. Code § 18.2-154 is clear, however, that when a person unlawfully shoots at a vehicle, and the occupant is put in peril and death results, that person is guilty of involuntary manslaughter." *Id.* at 385. The Court concluded that, under this analysis of legislative intent, a defendant could not be convicted of manslaughter under both laws:

> There is no evidence in the legislative history of Code § 18.2-154 or case law that suggests that the General Assembly intended to create an offense separate and distinct from common law involuntary manslaughter, or to permit the Commonwealth to obtain multiple convictions and punishments under Code § 18.2-154 and common law involuntary manslaughter for a single killing. *The enactment of Code § 18.2-154 did not make the punishment for involuntary manslaughter more severe, nor does it mitigate the punishment when the criminally negligent act leading to the death of an individual is shooting at an occupied vehicle. Code § 18.2-154 simply created a mechanism that permits the Commonwealth to substitute proof of distinct facts in place of criminal negligence.* The predicate facts of an unlawful shooting at an occupied vehicle resulting in death would always constitute criminal negligence, and therefore, a person committing that offense "*is* guilty of involuntary manslaughter." As the language of Code § 18.2-154 is unambiguous, "we are bound by the plain meaning of that language."

*Id.* at 386 (first emphasis added) (first quoting Code § 18.2-154; and then quoting *Blake v. Commonwealth*, 288 Va. 375, 381 (2014)).

We find that a similar analysis applies here, as the statutory language in Code § 18.2-279 is nearly identical to that found in Code § 18.2-154. In other words, Code § 18.2-279 "simply created a mechanism that permits the Commonwealth to substitute proof of distinct facts" to show second-degree murder. Thus, under *Gregg*, Coglio could not be convicted of common law second-degree murder and of second-degree murder under Code § 18.2-279 for the same shooting.

- 19 -

## 2. The Jury was Not Permitted to Assess a Second-Degree Murder Conviction Against Coglio Under Code § 18.2-279

However, here, Coglio was not indicted for second-degree murder under Code § 18.2-279, nor was the jury instructed that they could find him guilty of second-degree murder under that code section. Instead, his indictment simply alleged that he "did maliciously and feloniously discharge a firearm within a building then occupied by one or more persons in such manner as to endanger the lives of such person or persons." Similarly, the relevant jury instruction read: "If you find from the evidence that the Commonwealth has proved beyond a reasonable doubt each of the above elements of the crime as charged, then you shall find the defendant guilty of maliciously discharging a firearm." Again, the trial court specifically found that Coglio was only charged with shooting in an occupied building—not with shooting in an occupied building resulting in death.

Coglio argues on brief that "there is no requirement that such information be alleged in the indictment in order to trigger the sentencing scheme [under Code § 18.2-279]." Code § 18.2-279 states that a conviction for maliciously shooting under that section is a Class 4 felony, but that if someone dies as a result, it is second-degree murder. A Class 4 felony is punishable by 2 to 10 years in prison. Code § 18.2-10. Second-degree murder is punishable by 5 to 40 years in prison. Code § 18.2-32. Coglio's conviction order shows that he was convicted of shooting into an occupied building and describes this as a Class 4 felony. Thus, the "sentencing scheme" for second-degree murder was not automatically triggered in his case. Coglio's rights against double jeopardy were not violated—and could not have been—because he was not actually found guilty of second-degree murder under both statutes.[7]

---

[7] Here, the *Blockburger* analysis for maliciously shooting into an occupied building *without* causing the death of a person is quite different from the elements of second-degree murder and would not result in a double jeopardy violation. Again, Coglio was not charged with

- 20 -

Because Coglio was not convicted of second-degree murder under Code § 18.2-279,[8] nor did he receive "multiple punishments" for Logan's murder, we find that his double jeopardy rights were not violated in this case.

## CONCLUSION

The record contains sufficient evidence to support Coglio's convictions. We additionally find that Johnson's testimony regarding Logan's statements was properly admitted, as it was both relevant and more probative than prejudicial. Finally, we find that the protections against double jeopardy were not violated in this case.

*Affirmed.*

---

maliciously shooting and causing death under Code § 18.2-279—and the jury instructions did not permit a verdict of second-degree murder under Code § 18.2-279.

[8] Coglio argues on appeal that Code § 18.2-279's second-degree murder "sentencing scheme" may be triggered even though the Commonwealth did not allege in the indictment that a death occurred. As discussed above, it is clear that the second-degree sentencing scheme under the statute was not triggered in this trial, as Coglio was convicted and sentenced only for a Class 4 felony under Code § 18.2-279. We note that Coglio did not argue below or on appeal that, in a case involving death, the Commonwealth was not permitted to charge him only with maliciously discharging a firearm under Code § 18.2-279, rather than with the more serious second-degree murder charge that this code section may carry. As that issue has not been raised, we leave that question for another day.

- 21 -