COURT OF APPEALS OF VIRGINIA

Present:   Judges Huff, Malveaux and White
Argued at Norfolk, Virginia


ANTWAN CHRISTOPHER WILLIAMS
                                                    MEMORANDUM OPINION* BY
v.        Record No. 0648-23-1                JUDGE KIMBERLEY SLAYTON WHITE
                                                         JUNE 11, 2024
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF NORFOLK
Mary Jane Hall, Judge

J. Barry McCracken, Assistant Public Defender, for appellant.

Stephen J. Sovinsky, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


Following a jury trial, the trial court convicted Antwan Christopher Williams of 2 counts of

aggravated sexual battery of a child under the age of 13 and 2 counts of taking indecent liberties

with a child while in a custodial relationship.  The trial court sentenced Williams to a total of 12

years of imprisonment with 7 years and 6 months suspended.  Williams argues that the trial court

erred in admitting into evidence the videotaped forensic interviews of the two victims under the

hearsay exception provided by Code § 19.2-268.3, which permits the admission of certain hearsay

statements of child victims of specified crimes.  Williams also contends that the trial court erred in

admitting out-of-court statements that the victims made to their mother.  We find no trial court error

and affirm the judgment.

---

* This opinion is not designated for publication.  *See* Code § 17.1-413(A).

BACKGROUND

"In accordance with familiar principles of appellate review, the facts will be stated in the light most favorable to the Commonwealth, the prevailing party at trial." *Gerald v. Commonwealth*, 295 Va. 469, 472 (2018) (quoting *Scott v. Commonwealth*, 292 Va. 380, 381 (2016)). In doing so, we discard any of Williams's conflicting evidence, and regard as true all credible evidence favorable to the Commonwealth and all inferences that may reasonably be drawn from that evidence. *Id.* at 473.

In the spring of 2019, Kiara Beckett's twin sons, Ja. and Jo.,[1] were eight years old. The boys frequently attended church at The Birthing Place in Chesapeake with their paternal grandmother, Alice Randle. Through church activities, the boys became acquainted with Williams and his son C., who was about the same age as Ja. and Jo. With Beckett's permission, Randle left Ja. and Jo. for sleepovers at Williams's home three or four times. Typically, Williams watched television with the children and watched while they played video games or engaged in other similar activities.

On Easter weekend, 2019, Ja. and Jo. went for an overnight visit with C. at Williams's home. Ja. stated that he and C. were sleeping on the floor of the living room while Jo. slept on the couch. That night, while Ja. was sleeping on the living room floor, Williams reached under Ja.'s shorts and boxers and touched his penis. Ja. said nothing in the moment, but knew it was Williams touching him because "it was a big hand." Ja. pushed Williams's hand away. Nonetheless, Williams moved his hand back and touched Ja.'s private part again. Ja. turned to the side, moving away from Williams's hand.

---

[1] These names are used to designate them as they both have names that start with J, and they have the same last name. They are referred to as Ja. and Jo. in all relevant documents.

- 2 -

That same night, Williams was on the couch beside Jo., who had fallen asleep watching a movie. Williams reached under Jo.'s clothes and touched the child's penis. Jo. moved Williams's hand away.

In May 2019, because of an incident that had occurred at school, and at the request of the school, Beckett asked Randle to talk to Ja. and Jo. about "good touches" and "bad touches" while the boys were staying with her. Randle told the boys that a "bad touch" included contact with the "private area" or penis. After Randle's explanation, Jo. said that Williams "did that"; Ja. said that Williams "touched us there." When asked about receiving this information Randle stated, "I couldn't believe it, because I just felt like this was a gentleman I had trusted" and "I figured I could entrust him with my grandkids."

After receiving a phone call that caused her concern, Beckett left her workplace and went home. She found Randle parked in the driveway with Ja. and Jo., who were crying. When Beckett asked the boys what happened, they said that when they were sleeping at Williams's house, he "put his hands in their pants." Immediately after hearing the report, Beckett contacted the police.[2] A detective with the Norfolk Police Department testified that Beckett came into the Police Operation Center on May 20, 2019. He stated an arrest warrant was issued later after interviews were conducted with the victims. He stated that Williams turned himself in and denied any wrongdoing.

Beckett had noticed a change in the twins' demeanors after that visit. They "didn't go outside as much as they normally would go outside, and they're normal kids who like to play outside. They didn't go outside. It was like they were loners, and we couldn't really figure out

---

[2] The trial court overruled Williams's hearsay objection at trial to the report the boys made to their mother. Williams did not object to Beckett's comment that she went to the police immediately thereafter.

what was going on." "They didn't want to really do anything anymore, like they weren't their normal selves. And their normal selves would be, I want to go outside and play football with their friends. They were embarrassed that something happened to them, but we weren't sure what happened." The "good touch" and "bad touch" conversation "[m]ade them open up and [say] something had happened to them."

Randle had not noticed "a huge difference" in the victims after the Easter weekend, but "used to think [it] was kind of weird [that the twins] used to say, 'Mr. Antwan treats us nicer than he treats his son,' you know." After the May 2019 conversation, the boys were

> a little withdrawn, not wanting to be around Mr. Antwan or over to their house anymore; feeling uncomfortable about going to the church, thinking that he was going to be there. You know, those types of things. Not wanting to go to the park anymore, you know, afraid that we were going to encounter him at [the park], so we never went again.

When the police questioned Williams about Jo.'s and Ja.'s allegations, he denied any wrongdoing and could not explain why they would make such claims. Williams denied touching the genitals of Ja. or Jo.

Catherine Tricomi, a child forensic interviewer at the Children's Hospital of the King's Daughters, conducted forensic interviews of Jo. and Ja. separately on June 5, 2019. She maintained that such interviews were "a developmentally sensitive and appropriate and legally sound way to gather information from a child when there's allegations of abuse or exposure to violence." In his recorded interview, Ja. said that "Mr. Antwan" touched his private part during an overnight visit with Williams and his son.[3] Ja. said he had fallen asleep on the floor while they were watching a movie. Williams reached over, pulled down Ja.'s shorts and boxers, and

---

[3] At a pretrial hearing under Code § 19.2-268.3, the trial court ruled that the recordings of the interviews were admissible, and the Commonwealth introduced them at trial in its case-in-chief.

- 4 -

touched Ja.'s penis with one hand. Ja. said that he moved away, and Williams stopped, but later repeated the touching a second time. Ja. said he told his grandmother about the incident after she explained that certain touches were "nasty."

During his forensic interview, Jo. said that "Mr. Antwan" had felt his privates after pulling down the child's boxers and shorts. At the time, Jo. was on the couch with Williams and had fallen asleep during a movie. Williams used one hand to touch Jo.'s skin. Jo. said that he reported the touching to his grandmother after she talked to him about things that were "nasty." Related to the specific interviews of the two boys, the interviewer noted that nothing "stuck out to . . . [her] in terms of their statements being inaccurate or falsified." She further said that she was unaware of any reason they would "falsify or distort the events" concerning the alleged abuse by Williams. The boys were eight at the time of her interview.

In ruling on the Commonwealth's motion to admit the video recordings of the two interviews the trial court stated: "the statements . . . do have a sufficient indicia of reliability to make them inherently trustworthy, and the Court will grant the Commonwealth's motion, assuming the children testify, to present the videotapes of these statements as evidence in their case in chief." Prior to doing so the court observed that the "statements were taken less than two months after the date of the event . . . when these events would be fresh in the child's mind under the age of 8 years of age," that they "were taken in a very professional setting . . . with trained professionals who were . . . following the best practices," that "both of these children had personal knowledge," and that "8 years of age, is a sufficient age for a child to relate an event of this nature that occurred some six weeks prior." As to the other factors to be considered by the court, it noted it had no information concerning "maturity and mental state of the children," or any evidence of motives to falsify, or evidence the children were in pain or distress, or any evidence of the opportunity of Williams to have committed the acts.

After the close of the Commonwealth's case-in-chief, Williams moved to strike the evidence. The motion was based on alleged "inconsistencies" between the testimony of the victims and the forensic interviews played at trial, as well as the testimony of the mother and grandmother. The motion was overruled.

Testifying in his own behalf, Williams said that nothing unusual occurred during the time that Jo. and Ja. spent with him and his family on Easter weekend in 2019. He testified the victims stayed over at his house "[p]robably about three times." He specifically denied touching the genitals of the two minor victims. He denied there being "[a]ny bad blood" prior to the night in question between himself and the victims' mother or grandmother. However, at the conclusion of all the evidence, the jury convicted Williams of all four charged offenses. This appeal followed.

## ANALYSIS

### I. Admissibility of Victims' Forensic Interviews

Williams argues on appeal that the trial court erred in admitting the forensic interviews recorded and conducted by Tricomi. His main argument is that the trial court erred in admitting the recordings under Code § 19.2-268.3[4] upon a "a paucity of information to establish 'sufficient

---

[4] Code § 19.2-268.3 provides, in relevant part:

> A. As used in this section, "offense against children" means a violation or an attempt to violate . . . [§] 18.2-67.3 [aggravated sexual battery] . . . [or] [§] 18.2-370.1 [taking indecent liberties with child by person in custodial or supervisory relationship] . . . .
> B. An out-of-court statement made by a child who is under 13 years of age at the time of trial or hearing who is the alleged victim of an offense against children describing any act directed against the child relating to such alleged offense shall not be excluded as hearsay under Rule 2:802 of the Rules of Supreme Court of Virginia if both of the following apply:
> 1. The court finds, in a hearing conducted prior to a trial, that the time, content, and totality of circumstances surrounding the statement provide sufficient indicia of reliability so as to render it inherently

- 6 -

indicia of reliability' rendering the statements 'inherently trustworthy' in accordance with the requirements of the statute."

"[T]he determination of the admissibility of relevant evidence is within the sound discretion of the trial court subject to the test of abuse of that discretion." *Pulley v. Commonwealth*, 74 Va. App. 104, 118 (2021) (quoting *Jones v. Commonwealth*, 71 Va. App. 597, 602 (2020)). "A reviewing court can conclude that 'an abuse of discretion has occurred' only in cases in which 'reasonable jurists could not differ' about the correct result." *Id.* (quoting *Atkins v. Commonwealth*, 68 Va. App. 1, 7 (2017)). "Nevertheless, this Court reviews *de novo* any issue requiring statutory interpretation.'" *Chenevert v. Commonwealth*, 72 Va. App. 47, 53 (2020) (quoting *Alvarez Saucedo v. Commonwealth*, 71 Va. App. 31, 45 (2019)).

"Code § 19.2-268.3 provides a hearsay exception allowing the admission of out-of-court statements of victims of certain crimes if that victim is under the age of thirteen at the time of the trial." *Id.* at 54. "If the defendant is charged with one or more of approximately thirty different listed crimes against children . . . , then the statement may be admitted, despite being hearsay, if two requirements are met." *Id.* "First, the trial court must find—considering seven,

---

trustworthy. In determining such trustworthiness, the court may consider, among other things, the following factors:
    a. The child's personal knowledge of the event;
    b. The age, maturity, and mental state of the child;
    c. The credibility of the person testifying about the statement;
    d. Any apparent motive the child may have to falsify or distort the event, including bias or coercion;
    e. Whether the child was suffering pain or distress when making the statement; and
    f. Whether extrinsic evidence exists to show the defendant's opportunity to commit the act; and
2. The child:
    a. Testifies; or
    [b. Is declared unavailable if there is corroborative evidence of the act].

- 7 -

nonexclusive, enumerated factors—that 'sufficient indicia of reliability . . . render [the out-of-court statement by the child] inherently trustworthy.'" *Id.* (quoting Code § 19.2-268.3(B)(1)). "Second, the child must testify, or the trial court must declare the child 'unavailable as a witness' and 'corroborative evidence' of the 'offense against [the child]' must exist." *Id.* (quoting Code § 19.2-268.3(B)(2)).

With all other statutory requirements satisfied, the only issue here is whether the trial court reached the proper conclusion that the forensic interviews were inherently trustworthy through a proper sufficient indicia of reliability. Under Code § 19.2-268.3, when determining trustworthiness, the trial court "may consider, among other things," "[t]he child's personal knowledge of the event," "[t]he age, maturity, and mental state of the child," "[t]he credibility of the person testifying about the statement," "[a]ny apparent motive the child may have to falsify or distort the event, including bias or coercion," "[w]hether the child was suffering pain or distress when making the statement," and "[w]hether extrinsic evidence exists to show the defendant's opportunity to commit the act[.]" Code § 19.2-268.3(B)(1)(a)-(f).

The Commonwealth filed a pretrial motion *in limine* to admit the recorded forensic interviews of Ja. and Jo. under Code § 19.2-268.3. At the pretrial hearing, Tricomi explained that a forensic interview is "a developmentally sensitive and appropriate and legally sound way to gather information from a child" upon "allegations of abuse or exposure to violence." The purpose of the interview is to gather a child's statement using unbiased and non-leading questions. As part of the interview process, Tricomi stressed the importance of telling the truth and asked the child to promise to tell the truth. Tricomi had performed hundreds of forensic interviews. Tricomi said that before such interviews she had no interaction with law enforcement concerning possible prosecution.

- 8 -

Williams also argues on appeal that "[a]lthough the interviews were available on video recordings, they were not reviewed by the [trial] court." He asserts,

> The court was not apprised of the duration of each interview, the amount of detail contained in each statement, whether the statements were internally consistent or consistent with each other, whether either child had difficulty expressing themselves generally or in specifically articulating the events in question, their general emotional and mental state at the time of the interview, or their apparent maturity level.

Williams did not argue in the trial court, however, that the court was required to view and consider the content of the videos in making its pretrial determination of admissibility under Code § 19.2-268.3. Accordingly, we do not consider these assertions on appeal. *See* Rule 5A:18 ("No ruling of the trial court . . . will be considered as a basis for reversal unless an objection was stated with reasonable certainty at the time of the ruling, except for good cause shown or to enable this Court to attain the ends of justice."). If a party fails to timely and specifically object, he waives his argument on appeal. *Arrington v. Commonwealth*, 53 Va. App. 635, 641 (2009).

Addressing the specific point that Williams asserted in the trial court—that the court could not find the interviews inherently trustworthy without testimony from Ja. and Jo., we find that the trial court considered each of the factors set forth in Code § 19.2-268.3 and found the boys' statements inherently trustworthy and, thus, admissible. The interviews occurred two months after the incidents, which was a relatively short time so that the details would have remained fresh in the mind of an eight-year-old child. The interviews were in a "very professional setting" and conducted by "trained professionals" using "best practices." Both Ja. and Jo. had personal knowledge of the events and were of sufficient age to relate events of this nature. The trial court noted that Tricomi was credible as the witness to the statements and had conducted the interviews in accordance with the best practices in the field and using all her training and experience. In addition, the trial court heard no indication of a motive to fabricate the claims or

- 9 -

that the victims were suffering pain or distress at the time of their statements. The trial court granted the Commonwealth's motion to admit the recorded interviews during its case-in-chief, but refused the request to require the Commonwealth to introduce all of the prior statements the victims may have made about the claims. Thus, "the Court [found] in considering these factors that the statements . . . do have a sufficient indicia of reliability to make them inherently trustworthy, and the Court . . . grant[ed] the Commonwealth's motion, assuming the children testify, to present the videotapes of these statements as evidence in their case in chief." We agree.

The recorded interviews of the minor victims were properly admitted as out-of-court statements made by children as an exception to the hearsay rule and through the safe-harbor provision of Code § 19.2-268.3. The record thus supports the trial court's factually based conclusion that the forensic interviews were inherently trustworthy and admissible under Code § 19.2-268.3, and we find no abuse of discretion in the trial court's decision to admit them.[5]

II. Admissibility of Victims' Statements to Beckett

Williams claims that the trial court erred in admitting Ja.'s and Jo.'s report to Beckett that he "put his hands in their pants." Williams contends that Becketts's statement contains inadmissible hearsay. "'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Va. R. Evid. 2:801(c). "Hearsay evidence is inadmissible at trial unless it falls into one of the

---

[5] Williams also argues on appeal that "[a]lthough the interviews were available on video recordings, they were not reviewed by the [trial] court." Williams did not argue in the trial court, however, that the court was required to view and consider the content of the videos in making its pretrial determination of admissibility under Code § 19.2-268.3. Accordingly, we do not consider these assertions on appeal. *See* Rule 5A:18 ("No ruling of the trial court . . . will be considered as a basis for reversal unless an objection was stated with reasonable certainty at the time of the ruling, except for good cause shown or to enable this Court to attain the ends of justice."). If a party fails to timely and specifically object, he waives his argument on appeal. *Arrington*, 53 Va. App. at 641.

recognized exceptions to the rule." *Clay v. Commonwealth*, 33 Va. App. 96, 104 (2000) (en banc), *aff'd*, 262 Va. 253 (2001).

Under Code § 19.2-268.2, in a prosecution for criminal sexual assault, "the fact that the person injured made complaint of the offense recently after commission of the offense is admissible, not as independent evidence of the offense, but for the purpose of corroborating the testimony of the complaining witness." *See also* Va. R. Evid. 2:803(23). Code § 19.2-268.2 codifies Virginia's common law "recent complaint" rule, thus admitting "evidence of a prompt complaint of [a crime involving improper sexual conduct] . . . to corroborate the complaining witness' testimony regarding the occurrence of the [crime]." *Terry v. Commonwealth*, 24 Va. App. 627, 633 (1997). "[O]nly the fact of the complaint and not the details given therein may be admitted, but the scope of admission rests with the sound discretion of the trial court." *Woodard v. Commonwealth*, 19 Va. App. 24, 27 (1994). "Under this 'modern rule,' the 'only time requirement is that the complaint have been made without a delay which is unexplained or is inconsistent with the occurrence of the offense.'" *Wilson v. Commonwealth*, 46 Va. App. 73, 84 (2005) (quoting *Woodard*, 19 Va. App. at 27).

Williams maintains the boys' statements to their mother exceeded the scope of permissible testimony "both in context and content." Williams argues that only the fact of the complaint is admissible, not any of the details contained therein. *Lindsey v. Commonwealth*, 22 Va. App. 11, 15 (1996). Williams also contends that the "recent complaint" exception embraces only the fact of the complaint and not details reported by the victim. *Mitchell v. Commonwealth*, 25 Va. App. 81, 86 (1997). Finally, Williams claims that the statements made to the mother were not "in the nature of the complaint," but are actually statements elicited by Beckett in questioning. We disagree.

Ja. and Jo. made the report to Beckett after Randle shared information about "bad touches" and they then apparently realized that Williams's actions were wrong. The report that Beckett related at trial contained no extraneous details of events or commission of the crimes and was limited to the simple fact that Williams put his hand inside the boys' pants. The fact that the minor victims told their mother that "they were sleeping at [Williams's] house and he put his hands in their pants," was thoroughly established through other evidence, could not have therefore had more than the slightest influence on the jury, and, moreover, there was abundant evidence through the forensic interviews and the minor victims' testimony that Williams committed aggravated sexual battery and took indecent liberties against them. The *Mitchell v. Commonwealth* decision acknowledges that it is unreasonable for a victim, especially a child, to give his report in "succinct, technical terms." 25 Va. App. at 86. Descriptions of events, or acknowledgments that the event happened, such as in *Lindsey v. Commonwealth*, are acceptable ways to lodge a complaint. 22 Va. App. at 15. Upon these facts and circumstances, the trial court did not abuse its discretion in admitting Beckett's testimony about the boys' report as corroboration of their testimony. *See* Code § 19.2-268.2.

It is indeed only the fact of the complaint that is admissible, not any of the details contained therein. *Lindsey*, 22 Va. App. at 15. The "recent complaint" exception embraces only the fact of the complaint and not details reported by the victim. *Mitchell*, 25 Va. App. at 86.

## CONCLUSION

For the foregoing reasons, we affirm the trial court's judgment.

*Affirmed.*